USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/22/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
FLATIRON ACQUISITION VEHICLE, LLC  :
and CS PARADISO HOLDINGS, LLC,  :
 :
          Plaintiffs,  :
 :             1:17-cv-8987-GHW
      -v-  :
 :      MEMORANDUM OPINION
CSE MORTGAGE LLC, CAPITALSOURCE  :        AND ORDER
COMMERCIAL LOAN, 2006-2,  :
CAPITALSOURCE FINANCE LLC, and  :
CAPITALSOURCE INC.  :
 :
         Defendants.  :
------------------------------------------------------------ X

GREGORY H. WOODS, United States District Judge:

     In November of 2012, Patrick McGrath expressed interest in acquiring Plaintiff CS Paradiso

Holdings, LLC ("Paradiso"), a real estate company owned and controlled by Defendants CSE

Mortgage LLC ("CSE") and CapitalSource Commercial Loan LLC ("CS Commercial").  Mr.

McGrath created Flatiron Acquisition Vehicle, LLC ("Flatiron") for this purpose.  Before Flatiron

entered a contract to purchase Paradiso, however, Defendants informed Flatiron of unresolved

litigation involving the Tellico Village Property Owners Association (the "TVPOA"), which

managed properties that Paradiso owned in exchange for assessments from the owners of these

properties.  Flatiron wanted the litigation to be resolved before the acquisition.

     On July 22, 2013, Joe Steinberg—counsel for CSE and CS Commercial—emailed Eric

Diaz—counsel for Flatiron—and asserted that an agreement to settle that litigation (the "Settlement

Agreement") was fully-compiled and fully-executed.  This email is known in this litigation as "the JS

Email."  Under the Settlement Agreement, Paradiso and its owners assumed obligations to convey

deeds or record documents to transfer ownership of certain lots in the Tellico Village from Paradiso

back to the TVPOA.  Although all of the parties had agreed to the Settlement Agreement and the

Settlement Agreement was enforceable, the deal was "a little fast and loose." The parties never compiled finalized copies of the exhibits to the Settlement Agreement, and the JS Email attached exhibits scrawled with handwritten labels that were not exactly correct.

Because it was satisfied that the litigation was settled, Flatiron purchased Paradiso. Paradiso had continuing obligations under the Settlement Agreement after Flatiron acquired it. Flatiron and its counsel, Mr. Diaz—now also counsel for Paradiso—were aware of those obligations, but Paradiso failed to fulfill them within the agreed-upon timeline. Eventually, the TVPOA sued Paradiso and Defendants in Tennessee state court.

Plaintiffs now claim that Mr. Steinberg negligently misrepresented that the Settlement Agreement was final when it was not and that this was the cause of Paradiso's failure to meet its obligations under the Settlement Agreement. But Plaintiffs have failed to prove their negligent misrepresentation claim. The cause of Plaintiffs' failure to perform was not faulty exhibits or Defendants' alleged misrepresentation but, instead, poor management of Paradiso and poor lawyering on its behalf. For the reasons that follow, the Court finds for Defendants with respect to Plaintiffs' negligent misrepresentation claim, and for Defendants with respect to their claim for attorneys' fees.

## I.      BACKGROUND

This case has a long history; one that took several turns before it arrived at trial. On October 13, 2017, Flatiron and Paradiso commenced an action in New York state court against Defendants. Complaint, Ex. A to Notice of Removal, Dkt No. 1, at 2. Subsequently, Defendants removed the action to this Court. Notice of Removal at 1. Plaintiffs subsequently amended their complaint on December 22, 2017, Dkt No. 21, and again amended their complaint on February 12, 2018. Second Am. Compl. ("SAC"), Dkt No. 41. Defendants thereafter filed a motion to dismiss the SAC. Dkt No. 43.

The Court denied Defendants' motion to dismiss Plaintiffs' breach of contract claim and dismissed Plaintiffs' claim for breach of the Purchase Agreement "against CapitalSource [Inc.] and CapitalSource Finance because they [were] not parties to the [PA]" and against CSE Mortgage and CS Commercial because Plaintiffs could not identify a contractual obligation that those defendants had violated. *Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*, No. 17-cv-8987-GHW, 2019 WL 1244294, at *12–13 (S.D.N.Y. Mar. 18, 2019). The Court denied Plaintiffs leave to replead this claim because it concluded that repleading would be futile. *Id.* at *13. The Court dismissed Plaintiffs' claim for violation of Tennessee lien law and Plaintiffs' negligent misrepresentation claim. *Id.* at *14, *17–18. The Court granted Plaintiffs leave to replead both of these claims. *Id.* at *14, *18.

Plaintiffs again amended their complaint on April 16, 2019. Third Am. Compl. ("TAC"), Dkt No. 83. The TAC asserted that "[t]his case has taken a turn" because "[d]iscovery has uncovered that [the Settlement Agreement] was executed before exhibits A, B and C to that document were finalized and agreed upon." *Id.* ¶ 1. In the TAC, Plaintiffs asserted three causes of action. First, Paradiso alleged a breach of the Settlement Agreement against Defendants CapitalSource Inc. ("CI") and CapitalSource Finance ("CF"). *Id.* ¶¶ 215–25. Second, Paradiso alleged a violation of Tennessee lien law against all Defendants. *Id.* ¶¶ 226–65. Third, Paradiso and Flatiron alleged a negligent misrepresentation claim against all Defendants. *Id.* ¶¶ 266–91.

Defendants subsequently filed an answer to the TAC with two counterclaims. Answer to Am. Compl. with Countercls., Dkt No. 87. Defendants' first counterclaim was that Plaintiffs breached the Settlement Agreement. *Id.* at 49–50. Defendants' second counterclaim was for a declaratory judgment that it be named the "prevailing party" because the Purchase Agreement contains a clause awarding attorneys' fees to the prevailing party and the Court dismissed Plaintiffs' claim under the Purchase Agreement with prejudice in its prior opinion. *Id.* at 50–51.

3

Defendants filed a motion for summary judgment on all claims asserted in the TAC and on both of Defendants' counterclaims on June 28, 2019. Dkt Nos. 96–99, 103–05. The Court granted summary judgment for Defendants with respect to Plaintiffs' claims under Tennessee lien law and for breach of the Settlement Agreement. Dkt No. 116 at 33. The Court also granted summary judgment for Defendants with respect to their counterclaims for breach of the Settlement Agreement and for a declaratory judgment that CSE and CS Commercial are prevailing parties under the Purchase Agreement. *Id.* The Court denied Defendants' motion for summary judgment on Plaintiffs' negligent misrepresentation claim. *Id.* This and the amount of damages Defendants are entitled to as a prevailing party were the only claims remaining for resolution at this trial.

## II.   FINDINGS OF FACT

In a bench trial, "[i]t is within the province of the district court as the trier of fact to decide whose testimony should be credited. And as the trier of fact, the Court is entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness." *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012) (quotation omitted). The Court finds the following facts. For the avoidance of doubt, the Court has also found additional facts that are relevant to the analysis, which are not included in this section of the opinion, but are instead embedded in the discussion section.

### A.   The Entities and Assets Involved

Plaintiff Paradiso was formed in 2009 for the purpose of holding title to and managing real property, including the property in Tellico Village, a residential development in Tennessee. Paradiso is a Delaware limited liability company with a principal place of business in New York. Paradiso's sole member is Plaintiff Flatiron. Paradiso is a member-managed limited liability company, which has been managed by Flatiron since the date of its acquisition. It has neither a general counsel nor any employees. Plaintiff Flatiron is a Delaware limited liability company with a principal place of

4

business in New York.  Flatiron's sole member is Castlegrace Management LLC.  Castlegrace

Management LLC's sole member is Patrick McGrath, who is a citizen of New York.

Mr. McGrath also owns Aristone Holdings together with Todd Lippiatt—each owns 50% of

the entity.  Aristone Holdings is the owner of Aristone Realty Capital LLC.  Mr. McGrath, with the

assistance of his counsel at the Philadelphia-based law firm Jacoby Donner P.C. created Flatiron for

the purpose of acquiring Paradiso.  Eric Diaz was the lead partner for the Aristone relationship.  Mr.

McGrath and Mr. Diaz have been friends since high school.  Mr. Diaz and his law firm provided

legal services to Aristone, Flatiron, and, from the date of its acquisition, Paradiso.  As the Court will

describe in more detail, a number of associates at Jacoby Donner also represented Flatiron and

Paradiso under Mr. Diaz's supervision.  After the acquisition at issue in this lawsuit, Mr. Diaz left

Jacoby Donner and started his own firm, LareDiaz.  LareDiaz continued to represent Mr. McGrath's

companies.

Defendant CSE is a Delaware limited liability company with its principal place of business in

Maryland.  CSE's sole member is PacWest Bancorp ("PacWest").  PacWest is a Delaware

corporation with a principal place of business in California.  Defendant CI is now known as

PacWest and is a Delaware corporation with principal places of business in Maryland and California.

Defendant CF is a Delaware limited liability company with a principal place of business in Maryland.

CF's sole member is CapitalSource TRS LLC.  CapitalSource TRS LLC is a Delaware limited liability

company with a principal place of business in Maryland.  CapitalSource TRS LLC's sole member is

PacWest.

As of June 30, 2013, Paradiso had interests in approximately 5,500 lots in various

developments throughout the United States.  It maintained a list of its portfolio of lots in a Master

List Exel File (the "Master List").  Among these were the 300 lots in Tellico Village that are the

subject of this suit.  Established in 1985, Tellico Village is a planned residential and commercial

community that consists of over 5,000 acres of land alongside the Tellico Lake in Loudon County, and Monroe County, Tennessee.  Tellico Village is managed by the TVPOA.

It is worthwhile to spend a few sentences discussing the Master List and the terminology used in it to categorize the properties owned by Paradiso, both because the terminology seems to have engendered some confusion, and because, notwithstanding that fact, this Opinion adopts its terminology from time to time, so the Court wishes to highlight its limitations.  The Master List is a massive Excel spreadsheet.  The Court refers now to Defense Exhibit 4, which was sent to Mr. McGrath on April 5, 2013.  It lists all of the properties owned by Paradiso, and for each property, the assessor's parcel number ("APN"), the buyer's name, and whether the loan supported by the property was delinquent, and, if so, by how long.  The list can easily be sorted and filtered:  One can identify all of the properties in Tennessee, which comprise all of the Tellico Village properties, by simply checking a box in the list.

The Master List also categorizes properties using two terms that are important here:  The first category is "REOs", which stands for "Real Estate Owned."  The second category is "CFDs," which stands for contract for deeds.  A contract for deeds is a financing mechanism in which, rather than transferring ownership of the property to a buyer and retaining a mortgage, the lender retains title to the property, and only transfers the deed to their borrower when the loan is fully repaid.  Mr. Sylvester testified about CFDs as follows:  "When a third-party buyer of a CFD fell more than 30 days behind on their monthly loan installment payment, the CFD was deemed in default and thereafter referred to as a 'Non-Performing CFD.'"  CFDs that were not in default were referred to as "Performing CFDs."  The third category, less relevant here, are residential purchase contracts, or "RPCs."  These are lots that NRP had previously sold to third-party buyers pursuant to a standard mortgage agreement.  Mr. Sylvester testified that "unlike REOs and CFDs, RPCs are not lots owned by Paradiso."

This comment highlights the source of some potential confusion.  Both REOs and CFDs, as characterized in the Master List, were properties that were owned by Paradiso.  Properties that were labelled as CFDs were owned by Paradiso; the category labeled REOs excluded CFDs.  So the Master List's presentation of "REOs" did not include all of the real property owned by Paradiso despite the name of the category.  To compile a list of all of the real property owned by Paradiso from the Master List, one would have to select *both* REOs and CFDs.

The Master List presented to Aristone and Mr. McGrath as part of the acquisition process listed the properties owned by Paradiso, as follows:  260 lots designated as REOs; 16 lots that it owned subject to Non-Performing CFDs; and 24 lots it owned subject to Performing CFDs (collectively, the "Tellico Lots").[1]

## B.  Mr. McGrath Explores a Deal

### 1.  Mr. McGrath Seeks to Purchase Paradiso's Assets

Mr. McGrath had an old friend and former colleague from his days at Credit Suisse, Michael Szwajkowski, who was the prior head of finance at CF.  Around 2004, the structured finance group at CF made a loan to National Recreational Properties, Inc. and its affiliates (collectively, "NRP") for the acquisition of real estate parcels.  The parcels served as collateral for the loan.  Mr. Szwajkowski had oversight of the NRP portfolio until he left CF around 2010.  Mr. McGrath knew about Paradiso through Mr. Szwajkowski, who ultimately became an investor in Flatiron's acquisition of Paradiso.

Around November 2012, Mr. McGrath expressed an interest in acquiring Paradiso's assets. It appears that his interest in the portfolio was generated by the lead from Mr. Szwajkowski.

---

[1] While the Court refers to a singular "Master List," at least two versions of the list were sent to the Flatiron parties as part of the diligence process prior to the acquisition.  One was sent to Mr. McGrath on April 5, 2013.  A second was sent to both Mr. McGrath and Mr. Diaz on July 15, 2013.  The latter included legal descriptions of the properties in addition to the other information that the Court has described.

(Whether there were any limitations on Mr. Szwajkowski's ability to provide information about a portfolio of assets that he previously managed, or to participate economically in their acquisition is not an issue before the Court.)  At that time, CSE was the 100% owner of Paradiso.  CSE was not actively marketing Paradiso or its assets.  In January 2013, Mr. Sylvester contacted Mr. McGrath.  On February 11, 2014, Mr. McGrath confirmed that he was interested in acquiring "all" of Paradiso's assets "as[] is where is, no rep[resentations] and war[ranties]," which included ownership of the financing agreements—the contract for deed agreements and mortgage agreements—related thereto.

CSE and Mr. McGrath both retained counsel to negotiate the deal.  CSE retained Holland & Knight LLP to represent CSE.  Joseph Steinberg, then an associate at the firm, appears to have been the lead lawyer on the team.  No other lawyers representing CSE in the transaction have been identified to the Court.  Mr. Steinberg testified that he did not represent CF or CI in this transaction, as neither CF nor CI were owners of Paradiso.  The Court credits Mr. Steinberg's testimony on this point.  He was credible, and this simply makes sense given the structure of the ownership of the Paradiso equity.  Mr. McGrath retained his friend Eric Diaz, of Jacoby Donner P.C., to represent him, Aristone, and Flatiron, the vehicle for the acquisition.

Around March 18, 2013, the parties entered into a letter of intent, providing that Mr. McGrath's firm, Aristone, and/or one of its affiliates would purchase Paradiso's assets and loans "AS-IS, WHERE-IS."  The letter of intent originally provided for a 45-day due diligence period.  On March 25, 2013, Mr. McGrath sent an "Initial Due Diligence and Information Request" to Mr. Sylvester setting out a "preliminary list of the records, documents and other information that [Aristone] would like to obtain and review" in connection with its purchase of the assets of Paradiso.  This list included servicing agreements for the REO and CFD assets, the "tax parcel ID," "legal address," and "homeowners assessments."  Mr. Sylvester provided all of the information Mr.

McGrath requested.  He also gave Mr. McGrath unfettered access to a data room with all of

Paradiso's files, including files maintained by its property manager and loan receivables service and

the Master List that listed every lot and contract in which Paradiso had an interest.  As described

above, the list was readily sorted and showed all of the Tellico Village properties along with their

APNs.

### 2.   Mr. McGrath Changes the Transaction to an Equity Purchase

Around April 2, 2013, Mr. McGrath inquired whether the deal could be structured as an

acquisition of Paradiso's equity, rather than an asset sale.  Mr. McGrath asked whether "buy[ing] the

entity [Paradiso]," would be "easier . . . from a transfer/recording perspective," compared to an

asset purchase of Paradiso's holdings.  On April 4, 2013, Mr. Sylvester informed Mr. McGrath that

CSE was willing to sell Paradiso through an equity sale, but that he and Mr. McGrath would need to

discuss liabilities that would transfer with the company's equity, in particular pending litigation

affecting the 300 Tellico Lots.  This litigation was *Tellico Village Property Owners Ass'n, Inc. v. Nat'l*

*Recreational Props. Of Tellico Village, LLC, et al.*, Case No. 11751 (Loudon Cty. 2010) (the "2010

Loudon County Lawsuit"); the case was filed on November 16, 2010.

On April 5, 2013, Mr. Sylvester sent Mr. McGrath the Master List.  He disclosed to Mr.

McGrath that Paradiso was the record holder for "300 lots."  He disclosed that these lots consisted

of REOs and CFDs, and that 260 of these were REOs.  He also sent Mr. McGrath the draft order

granting partial summary judgment against Paradiso.  While that draft of the order was not yet final,

it described the amount of the judgment to be entered against Paradiso as $1,263,881.68.  It also

required Paradiso to pay assessments and fees on the lots owned by Paradiso going forward.  As a

result of these communications, Mr. McGrath was certainly aware of the litigation against Paradiso.

And as an experienced investor, Mr. McGrath was aware that if he structured the transaction as an

equity transaction, he would own a company—Paradiso—that was party to, and liable with respect

to, this litigation.  On April 10, 2013, Mr. McGrath reached out to Mr. Sylvester and Sue Choi to

discuss "how to convey these assets in light of the judgment against the company."

On April 22, 2013, Mr. McGrath reiterated to Mr. Sylvester that he preferred to buy the

equity of Paradiso, rather than its assets, and proposed a reduction in purchase price or some other

agreement as to who would be responsible for the 2010 Loudon County Lawsuit.  Mr. Sylvester

informed him that they were "negotiating with the [TV]POA" to try to settle the lawsuit.  In

response, by email Mr. McGrath proposed that either CSE "[p]rovide indemnity up to the purchase

px of 3.75 mm for losses related to judgment and/or related assets," or that CSE "[d]iscount the

Purchase Price by some amount" and "[c]ome to some agreement as to who will be responsible for

the resolution of the TVPOA lawsuit."  Mr. McGrath suggested that Flatiron "[b]uy 100% of the

membership interests in CS Paradiso LLC but discount purchase px by 1.5 mm to 2.25 mm" in

exchange for Paradiso being responsible for the lawsuit post-acquisition.

On May 1, 2013, Mr. Sylvester advised Mr. McGrath that Paradiso, CF and CI were close to

settling the 2010 Loudon County Lawsuit.  Mr. Sylvester explained that under the proposed

settlement, "Paradiso would pay the [TV]POA a TBD amount of cash plus convey all of its Tellico

Village unsold inventory REO . . . as well as the lots that [Paradiso] owns in [Tellico Village] that are

subject to a defaulted CFD . . . .  The Tellico Village lots owned by [Paradiso] that are subject to a

performing CFD . . . as well as the [Tellico Village] RPC receivables [], would all be retained by

[Paradiso]."  Mr. McGrath was advised and understood that Paradiso would convey to TVPOA 261

REOs and 15 non-performing CFDs, and that Paradiso would only retain the 24 performing CFDs.

Mr. McGrath responded that day, saying that the terms were "excellent news" and "a

reasonable approach to resolve the matter."  Upon hearing this news, he was "willing to move the

process forward."  Mr. McGrath was aware of, and approved, the terms of the settlement.  He knew

that the deal required the transfer of 276 properties, and that Paradiso would retain only the 24

properties that were subject to Performing CFDs.  On or around June 4, 2013, Mr. McGrath

determined that an affiliate of Aristone's, Plaintiff Flatiron, would be the formal purchaser of

Paradiso.

On June 21, 2013, Mr. McGrath emailed Mr. Sylvester and informed him that he was willing

to "terminate the Due Diligence Period and proceed to closing . . . no later than June 28, 2013"

subject to, among other things, "[r]esolution of [2010 Loudon County Lawsuit] or in lieu thereof, a

purchase price holdback of $1.3mm" instead of the previous requested discount of $1.5mm to

$2.5mm.  But there was never any agreement on a price reduction.  Instead, the parties mutually

abandoned the June 28, 2013 closing and subsequently entered into a fifth amended and restated

escrow agreement, extending the due diligence period and closing date until July 23, 2013.

### C.  The Settlement Agreement

#### 1.  Mr. McGrath Reviews the Settlement Agreement

On June 25, 2013, Mr. McGrath requested the "current form of settlement agreement for

review."  Later that day, Mr. Sylvester sent Mr. McGrath the "current form of settlement agreement

with TVPOA."  Paradiso, CI, and CF, through their counsel Oliver Adams, and the TVPOA,

through its counsel Richie Brabham, continued to negotiate the terms of the Settlement Agreement.

During this time period, Mr. Sylvester had conversations with Mr. McGrath advising him as to the

terms of the settlement, including, as he had conveyed before, that Paradiso would convey the

REOs and the Non-Performing CFDs and would retain the Performing CFDs.

On July 9, 2013, Mr. Brabham and Mr. Adams, on behalf of their respective clients, agreed

to settle the 2010 Loudon County Lawsuit in exchange for a cash payment of $725,000 plus another

$25,000 to the TVPOA and conveyance of Paradiso's REOs and Non-Performing CFDs, with

Paradiso to retain its Performing CFDs.  On July 10, 2013, Mr. Brabham sent Mr. Adams a revised

draft Settlement Agreement proposing that Settlement Agreement include two additional exhibits:

an Exhibit B to list the CFDs whose interests Paradiso was to assign to the TVPOA, and an Exhibit C to list the CFDs that Paradiso would retain.  Exhibit A was to list the properties Paradiso was to convey to the TVPOA by quitclaim deed.

Mr. Adams sent this revised draft to Mr. Sylvester.  On July 11, 2013, Mr. Sylvester created "three lists, one for each REO (260), CFD non-performing (16) and CFD performing (24)."  These lists were not labeled as exhibits to the Settlement Agreement, but Mr. Sylvester understood them to contain the information required by the Settlement Agreement for inclusion in the exhibits required by the then-draft Settlement Agreement.  It is important to note here that Mr. Sylvester is not a lawyer.  He believed at the time that he sent the email that the list of REOs provided the information required to be contained in Exhibit A of the proposed Settlement Agreement; that the list of Non-Performing CFDs contained the information required to be contained in Exhibit B of the proposed Settlement Agreement, and that the list of Performing CFDs contained the information required to be contained in Exhibit C to the proposed Settlement Agreement.  Mr. Sylvester then emailed those lists to Mr. Adams.  Going forward, the Court will refer to Mr. Sylvester's July 11 email as the "July 11 Email."  Mr. Adams later transmitted the lists to Mr. Brabham at the TVPOA.  As the Court will describe below, he definitely sent them to Mr. Brabham on July 23, but the Court credits Mr. Adams' testimony that he sent the lists to Mr. Brabham before that date as well.

On July 12, 2013, Mr. Adams asked Mr. Sylvester to separate the REOs and Non-Performing CFDs by county for purposes of recording the quitclaim deeds and lien releases.  Mr. Sylvester did that.  The lists that he created were substantively identical to those contained in the July 11 Email.  Mr. Sylvester transmitted those schedules by email to Mr. Adams later during the day on July 12.  The Court will refer to that July 12 email from Mr. Sylvester going forward as the "July 12 Email."  The difference between these schedules and those attached to the July 11 Email was that

12

the properties listed in the attachments to the July 12 Email were organized by county.  In the July

12 Email, Mr. Sylvester responded to Mr. Adams, who had asked to confirm that there were only 16

CFDs being assigned, and that the 260 REOs would be assigned.  Mr. Sylvester sent the list of the

REOS and Non-Performing CFDs by county, because those were the properties to be transferred to

the TVPOA.  Mr. Sylvester wrote that "we are retaining the 24 performing CFDS and their

respective lots."  This demonstrated that both Mr. Sylvester and Mr. Adams were aware of the

fundamental requirements of the TVPOA settlement—that 276 properties be transferred by deed.

And, indeed, Mr. Adams took these lists and created draft quitclaim deeds and lien releases

as required under the Settlement Agreement; he sent them to Mr. Brabham on July 16, 2013.  The

quitclaim deeds that Mr. Adams prepared included all 276 properties to be transferred to the

TVPOA—all of the so-called REOs and Non-Performing CFDs.

That day, Mr. Brabham informed Mr. Adams that the TVPOA accepted his settlement offer:

Paradiso would convey the REOs and Non-Performing CFDs to the TVPOA, and Paradiso would

retain the Performing CFDs.  Mr. Brabham and Mr. Adams were in agreement about the specific

260 REOs and 16 Non-Performing CFDs that Paradiso would convey to the TVPOA.  As of July

16, 2013, the lots to be conveyed and retained were final and understood by all parties.  And the

parties all understood that the tables sent by Mr. Sylvester in the July 11 email contained the data

required to be included in the schedules to the Settlement Agreement.

On July 15, 2013, Mr. Sylvester emailed Mr. McGrath and Mr. Diaz, copying Ms. Choi and

Mr. Steinberg, to inform them that "[TV]POA is requiring we include a provision in the settlement

agreement that [] Paradiso will keep the assessments current on the 24 retained CFD lots."  Mr.

Sylvester stated in the email that he wanted to "highlight" this change as it would be "an ongoing

obligation of [Paradiso]."  Mr. McGrath responded that he was "fine" with that provision.  So Mr.

McGrath knew about this continuing obligation.  The properties to be transferred were the same as

Mr. McGrath had been informed about earlier.

The legal team representing Flatiron in the acquisition was also reviewing the draft Settlement Agreement.  On July 18, 2020, Bridget Murphy, an associate at Jacoby Donner, scheduled a conference call with Ms. Choi to discuss, among other things, the draft Settlement Agreement. Mr. Diaz, and another Jacoby Donner lawyer, Shana McMahon, were copied on the email scheduling the call, and subsequent correspondence about the terms of the Settlement Agreement. Ms. Murphy suggested the inclusion of specific language in the Settlement Agreement regarding "tort exclusion."  The substance of the proposed language was ultimately included in the final Settlement Agreement.

On July 18, 2013, Mr. Sylvester sent Mr. McGrath the "current version of settlement agreement" as "agreed to by the [TV]POA."  Mr. Sylvester's email included in the text the substance of Section 1 of the Settlement Agreement, providing Paradiso's obligations prior to closing.  That same day, Mr. McGrath said "[s]ubject to legal signing off [he] was fine with" the current version of the Settlement Agreement.

So both Mr. McGrath, as the business person, and his lawyers at Jacoby Donner, were fully aware of the terms of the Settlement Agreement and were involved in negotiating its final terms.

## 2. The Settlement Agreement Is Consummated Under the Terms to Which Mr. McGrath Agreed

On July 19, 2013, Paradiso, CF and CI signed the Settlement Agreement; the TVPOA signed on July 22.  The Settlement Agreement was enforceable as of July 22, 2013, and became effective on July 25, 2013.  The TVPOA, Paradiso, CI, and CF understood that, under the Settlement Agreement, Paradiso would only retain the 24 Performing CFDs, and would convey to the TVPOA the 260 REOs and 16 Non-Performing CFDs.  There was a meeting of the minds regarding what would happen to Paradiso's assets.  As Mr. Brabham testified, "the deal was that . . . Paradiso was going to transfer whatever properties they had except for some performing lots that they wanted to

keep, which we didn't care about." All of the parties understood the deal, and they understood its terms when the Settlement Agreement was executed.

### i. The closing was a little "fast and loose"

The TVPOA and CapitalSource signatories to the Settlement Agreement signed versions of the Settlement Agreement that did not have the exhibits attached. (This is not good practice, for the reasons illustrated by this case, but happens frequently in corporate transactions.)

And this was particularly not good practice here because there was a glitch with respect to the exhibits to the Settlement Agreement. The Court lingers on that issue now because it lies at the heart of this litigation. As the Court found above, Mr. Adams transmitted the lists of properties attached to the July 11 Email and the July 12 Email to Mr. Brabham after he received them— sometime before July 19. The Court credits Mr. Adams' testimony that he sent the lists to Mr. Brabham. On July 23, 2013, Mr. Adams sent Mr. Brabham the lists of the REOs, Non-Performing CFDs, and Performing CFDs. He sent one set of lists broken out by county, and another set of lists that were not. The Court believes that the attachments to the emails that Mr. Adams sent were the same attachments that were attached to the July 11 Email, and the July 12 Email. Given the timing of the transmission of those documents, the Court infers that Mr. Adams was responding to a request from Mr. Brabham for the documents that would comprise the exhibits to the Settlement Agreement. The schedules forwarded by Mr. Adams to Mr. Brabham—both on July 23 and previously, contained all of the information required to be included in the schedules to the Settlement Agreement.

The issue, however, is that Exhibit A to the Settlement Agreement required disclosure of *all* of the real property owned by Paradiso to be transferred. Because properties designated in the Master List as CFDs are owned by Paradiso, the Settlement Agreement's Exhibit A was supposed to contain both the list of so-called REOs *and* the list of Non-Performing CFDs. Mr. Brabham knew

this—a later email shows that he labelled the REO and Non-Performing CFDs lists collectively as Exhibit A.  However, while both Mr. Sylvester and Mr. Adams correctly believed that the schedules attached to the July 11 and July 12 Emails, later forwarded to Brabham, contained all of the information required for inclusion in the Settlement Agreement's schedules—they did—Mr. Adams and Mr. Sylvester both believed that the REO list alone corresponded to Exhibit A.

The Court does not know why they thought that—after all, both knew the terms of the business deal.  It may be that they were misled by the name of the category of REOs, thinking that it contained all of the properties owned by Paradiso, including CFDs; it may be that they simply did not carefully read the description of the exhibits crafted by Mr. Brabham.  But for whatever reason, Mr. Adams, like Mr. Sylvester, believed that each of the lists that were forwarded to Mr. Brabham corresponded to Exhibits A, B, and C, respectively.  In that, they erred.  The lists should have been organized as Mr. Brabham organized them:  Exhibit A should have contained both the REO list and the Non-Performing CFD list.  But, despite that, Paradiso never misunderstood the business terms of its deal with the TVPOA; they knew that they were to transfer all owned property—REOs and Non-Performing CFDs—to the TVPOA.  And the documents that Paradiso had exchanged with the TVPOA as the exhibits to the Settlement Agreement did indeed contain all of the information required to be contained in those exhibits.

Mr. Adams' mistaken understanding regarding the documents intended to comprise Exhibit A might have been resolved had Mr. Brabham and Mr. Adams taken the time to create a formal closing binder for the Settlement Agreement, containing both the executed agreement and its exhibits.  They did not.  As Mr. Brabham testified, "[t]here was no formal closing binder.  It was a little fast and loose."  The Court does not believe that the TVPOA and Paradiso ever exchanged a version of the Settlement Agreement with all of the exhibits attached and properly labeled.  They did, however, exchange the agreement and all of the schedules that comprised the exhibits.

16

Despite this oversight, the Settlement Agreement was enforceable at this time as all parties understood and agreed to the deal; Mr. McGrath was also aware of the terms because Mr. Sylvester had previously informed him of them.

On July 23, 2013, Paradiso, CF, CI, and the TVPOA executed and filed an Agreed Order of Compromise and Dismissal, resolving the 2010 Loudon County Lawsuit. This was consistent with the parties' understanding that the Settlement Agreement was effective and resolved their dispute. The Court "so ordered" the dismissal of the litigation with prejudice on July 30, 2013.

### ii. The terms of the Settlement Agreement

This litigation would likely never have occurred had the parties complied with their obligations under the Settlement Agreement. So it is worthwhile to describe the text of the most pertinent provisions of the Settlement Agreement, giving rise to those obligations, now. Section 1 of the Settlement Agreement, titled "Settlement Terms" states the following:

> Subject to the terms and conditions stated herein, (i) CS shall convey the parcels of real property, as more particularly described in Exhibit A hereto (collectively the "Properties"), to Plaintiff or its designee by quitclaim deed, and shall also assign all of its interest in the corresponding contract for deeds for the Properties, as more particularly described on Exhibit B; (ii) Defendants or their affiliates, successors or assigns, as applicable, shall promptly record releases of all Deeds of Trust, Security Agreements, Fixture Filings, Assignments of Rents and Leases, and amendments thereto, or similar security instruments of record, which may encumber the Properties in favor of any of the Defendants or their affiliates, successors or assigns (the "Release Documents"); (iii) CI or CF shall pay Plaintiff $725,000.00 on or before the Closing Date in full and final settlement of all Claims; (iv) CS, CI, and CF, for so long as CI and CF own (directly or indirectly) CS, agree to keep the TVPOA member assessment accounts for the 24 parcels of Tellico Village real property still owned by CS and more particularly described on Exhibit C hereto (the "Retained Parcels") less than thirty (30) days past due so long as (a) any of Defendants retain a legal or equitable interest in such Retained Parcel(s) and (b) payments under the CFD corresponding to such Retained Parcel(s) are less than thirty (30) days past due; provided that if a CFD corresponding to a Retained Parcel(s) becomes more than thirty (30) days past due, then subject to clause (v) below, CS may within a reasonable time thereafter (not to exceed 120 days) quitclaim such Retained Parcel(s) to TVPOA so long as Release Documents (as described in clause (ii) above) are simultaneously recorded sufficient to release any encumbrances otherwise claimed in favor of any of the Defendants or their affiliates, successors or assigns with respect to any such Retained Parcel(s) being conveyed, in full satisfaction of Defendants' obligations under this Section (iv) as to

17

any such Retained Parcel(s) being conveyed; (v) as further consideration, CI or CF shall pay Plaintiff on or before the Closing Date an additional $25,000.00 which will be applied as an offset against future TVPOA assessments and fees for the Retained Parcels; (vi) Plaintiff shall dismiss the Lawsuit with prejudice and the Parties shall mutually release one another from any and all Claims; and (vii) Plaintiff and Defendants shall execute an Order of Compromise and Dismissal whereby all Claims shall be dismissed with prejudice (collectively the "Settlement Terms").

The Settlement Agreement also provided that "[t]he quitclaim deed and the Release Documents shall be recorded on or before August 19, 2013. Within a reasonable time after closing, not later than August 19, 2013, CS shall deliver the assignment of the contract for deed rights corresponding to the Properties." The Settlement Agreement is governed by the laws of the State of Tennessee.

### 3.  The Purchase Agreement Is Finalized

While Mr. Adams and Paradiso were working to resolve the TVPOA litigation, CSE's representatives, Mr. McGrath, Flatiron, and their representatives were working in parallel to finalize Flatiron's purchase of Paradiso's equity interests from CSE. By July 23, 2020, a Limited Liability Company Interest Purchase Agreement had been negotiated. For now, to set the stage for a discussion of the circumstances of the notorious, allegedly deceptive "JS Email" that is the basis of the claims being tried, the Court will focus on just a few of the features of the Purchase Agreement.

As of July 23, 2013, the Purchase Agreement was substantially final. Section 6.1 of the Purchase Agreement described conditions to the "Buyer's"—that is Flatiron's—obligations to purchase Paradiso. As the Court has noted previously, there was no express condition to closing directly tied to the settlement of the TVPOA litigation. However, Section 6.1(c) of the Purchase Agreement establishes as a condition to Flatiron's obligation to buy Paradiso that the "Seller"—that is CSE—deliver all of the contracts to which Paradiso was a party, as set forth on Schedule C to the Purchase Agreement. The Settlement Agreement was the last of the contracts listed in that

Schedule.[2]  The Purchase Agreement also contained a representation that there was no material

pending litigation against Paradiso, which was true as of July 23 as far as the Court is aware, because

the 2010 TVPOA litigation had been settled.  And it was a condition to closing under the Purchase

Agreement that the representations and warranties be true.

### 4.   Flatiron Receives the Notice of the Consummated Settlement Agreement and Releases Its Signature Pages

Starting in the morning on July 23, 2013, a legal assistant at Jacoby Donner started to email

Mr. Steinberg requesting the exhibits to the Settlement Agreement.  By that point, the Jacoby

Donner team had the executed agreement itself, as referenced in Schedule C to the Purchase

Agreement, but they did not have the exhibits to the agreement.  So Jacoby's paralegal was following

up—I infer that she did so in order to make sure that they had copies of the documents listed on

Schedule C.

Mr. Steinberg had not worked on negotiating the Settlement Agreement; did not have a copy

of the TVPOA Settlement Agreement; and was unaware of what the exhibits were.  So in the early

afternoon of July 23, Mr. Steinberg emailed Mr. Adams asking if he had "a copy of the settlement

agreement with the exhibits attached."  His email copied a number of people from Capital Source,

including Mr. Sylvester and Ms. Choi.  Mr. Adams did not respond.

Around 6 p.m. that day, Mr. Steinberg emailed Mr. Diaz asking if there was "anything else"

needed for Flatiron to release its signature pages.  The Court believes that reference to "anything

else" meant anything other than the missing Settlement Agreement exhibits.  From the time stamps

on the emails, the Court can infer what happened from there.  The parties were close to being able

to close the deal.  Mr. Adams, local Tennessee counsel, was not responding, and it was getting late

---

[2] As an aside, as the Court has noted before, oddly, the Purchase Agreement, negotiated by Jacoby Donner, did not contain a representation or warranty that the documents set forth on Schedule C were accurate or true and correct.  If Jacoby Donner had included such a representation, which may be a standard provision in such an agreement, Paradiso might have had a claim for a breach of a representation.

into the evening.  So, rather than waiting for Mr. Adams to respond, Ms. Choi sent Mr. Steinberg

the executed Settlement Agreement, but the iteration of the Settlement Agreement that she sent him

did not attach exhibits.

Later in the evening, in an email timestamped 8:48 p.m., Ms. Choi forwarded Mr. Steinberg

Mr. Sylvester's July 12 Email with its three lists of 260 REOs and 16 Non-Performing CFDs, broken

down by county, and Performing CFDs.  Then in an email timestamped 10:13 p.m., Mr. Sylvester

responded to Mr. Steinberg's request by forwarding his July 11 Email with the same lists of

properties he had previously sent to Mr. Adams comprising the 300 Tellico Lots at issue, not broken

out by county.

Understandably, Mr. Steinberg was unable to discern which of the documents he had

received from his clients were the appropriate versions of the exhibits to the TVPOA Settlement

Agreement.  Not only were the documents not labeled with the correct exhibit references, he

received two different sets of documents from his clients—the version of the lists broken out by

county from the July 12 Email, and the version from the July 11 Email.  The cover emails from Mr.

Sylvester and Ms. Choi provided no information to help Mr. Steinberg identify which documents

were which.  So in order to confirm which exhibit was which for the Settlement Agreement, Mr.

Steinberg asked Mr. Sylvester.

During a call, Mr. Sylvester and Mr. Steinberg discussed which lists corresponded to which

exhibits to the Settlement Agreement.  Mr. Sylvester told Mr. Steinberg that he should use the

schedules from the July 12 Email that had been forwarded to Mr. Steinberg by Ms. Choi.  And Mr.

Sylvester told Mr. Steinberg that the list of 260 REOs was Exhibit A; the list of 16 Non-Performing

CFDs was Exhibit B; and the list of 24 Performing CFDs was Exhibit C.  As the Court described

above, Mr. Steinberg believed that to be the correct break-down of the exhibits.

This conversation was happening late at night on the day that Mr. Steinberg hoped to be

able to close the deal.  After the conversation, Mr. Steinberg scrawled in his (not particularly neat) handwriting "Exhibit A" on top of the REO list; "Exhibit B" on the top of the Non-Performing CFD list; and "Exhibit C" on the top of the Performing CFD list.  Then he went to scan the documents together with the full copy of the Settlement Agreement that he had received from Ms. Choi.  In that late-night scanning job, Mr. Steinberg made a mistake.  He accidentally scanned the list of 230 Loudon County REOs twice.  As a result, the version of Exhibit A that he attached to the Settlement Agreement contained 490 REOs, even though this list only had 260 unique APNs.

Later that night, in an email timestamped 10:51 p.m. in what was likely Central Time, Mr. Steinberg sent an email to Mr. Diaz and his colleagues at Jacoby Donner.  In the email, Mr. Steinberg wrote the following:  "Fully-compiled, fully-executed settlement agreement attached." DX039 (the "JS Email").  The attached document contained the executed Settlement Agreement with the 300 Tellico Lots reflected in the exhibits:  the 260 REOs in Exhibit A, 16 Non-Performing CFDs in Exhibit B, and 24 Performing CFDs in Exhibit C.  Because of the scanning error, Exhibit A contained 490 REOs, more than the 300 properties owned in Tellico Village.  And his Exhibit A was not exactly correct for another reason:  The Settlement Agreement provided that Exhibit A consisted of all "Properties" to be transferred.  So Exhibit A should have included both the REOs and the Non-Performing CFDs, for a total of 276 lots; Mr. Steinberg's version included only the REO list.

After Mr. Diaz received the JS Email, Diaz's office informed Mr. McGrath that Flatiron had received proof demonstrating that the Settlement Agreement was final and that Flatiron had the final exhibits to the final agreement.  The Court does not credit Mr. Diaz's testimony that he forwarded the agreement itself to Mr. McGrath; no documentation supported the testimony and the testimony was not credible.

Mr. Diaz testified that he "noted that there were handwritten exhibit designation, which is

somewhat odd." Mr. Diaz knew there was something a bit off about the exhibits: As an experienced deal lawyer, he knew that ersatz handwritten exhibit labels were not customary. Because his firm had reviewed the Settlement Agreement and knew the terms of the deal reflected in it, he knew that there were only 300 properties to be transferred, and the Exhibit A contained more than 300 properties. But he failed investigate further. He testified that "there was no reason for me to even think maybe there's something amiss here" because "Steinberg and his firm are reputable." The Court does not credit his testimony that there was no reason for him to think that there was something amiss—Mr. Diaz, again, is Mr. McGrath's long-term friend, and Mr. Diaz's current firm is still doing business for Mr. McGrath's companies. There was ample reason for him to believe that something was amiss—he knew that Paradiso was transferring 300 properties and he just received a list that contained nearly 500 entries. But the Court does believe him when he said that he relied on the fact that Steinberg and his firm were reputable—as a result, he accepted the document without consideration. Collecting the final document was also a bit of a formality at that point, because Mr. Diaz knew that the deal had been struck to terminate the 2010 TVPOA Litigation.

Mr. McGrath testified that the final exhibits were important because Paradiso was contributing, as consideration, valuable assets in order to "buy peace" and to satisfy the debts and liens that CF had on the properties. Of course, it was important that the settlement agreement be completed and be completed on the terms that Mr. McGrath had agreed to. It was important that the TVPOA litigation have been resolved. Both of these conditions were satisfied. But the Court does not believe that it was significant to Mr. McGrath or Flatiron that the *exhibits* forwarded by Mr. Steinberg accidentally duplicated some of the properties in Exhibit A and only included in Exhibit B properties that should have also been included in Exhibit A. That mix up was immaterial and had no impact on Flatiron or its decision to go forward with the acquisition of Paradiso. While Plaintiffs do not concede this point, the Court believes that it is in part because of the evident reality of this

22

point, they have embraced an alternative theory that the representation was made to Paradiso (the entity bought by Flatiron), rather than Flatiron (the buyer). That theory makes no sense, for reasons that the Court will discuss below.

### D. Flatiron Acquires Paradiso

Mr. McGrath testified that the settlement with the TVPOA was a pre-condition to closing the purchase and, indeed, Flatiron did not close until they were told the settlement was done and they had been provided with copies of the final settlement. But Flatiron and its counsel neglected to make consummation of the settlement a condition to closing. Instead, they dealt with this issue by including a no litigation representation condition to closing and the requirement that Paradiso's contracts, including the TVPOA Settlement Agreement, be provided to Flatiron. Mr. Steinberg understood that delivery of the Settlement Agreement and its exhibits to Flatiron's counsel was a condition to their release of their signature pages.

On July 23, 2013, CSE and CS Commercial entered into the Purchase Agreement with Flatiron, effective July 25, 2013, whereby CSE and CS Commercial sold their interest in Paradiso to Flatiron. Mr. Steinberg only represented CSE and CS Commercial in this transaction. CF and CI were not parties to the Purchase Agreement. CF and CI were not owners and, accordingly, not sellers of Paradiso and not represented by Mr. Steinberg. The final purchase price for Paradiso was $3,107,308.59, which was based on an algorithm that took into account the aggregate outstanding principal of performing loans (as of June 30, 2013) multiplied by 0.32475. The undiscounted value of the performing loans was $9,568,309.75. The purchase price ascribed zero value to the many non-performing loans contained in Paradiso's portfolio, despite the fact that they were secured by real property. So Flatiron got a portfolio of loans supported by thousands of pieces of real property, many of which, as with the Tellico Village properties, Paradiso held title to, for less than the price of a single townhouse in Manhattan. Details surrounding the performing loans were set forth in the

Master List.

There is evidence that this transaction was quite a good deal for Flatiron. Mr. McGrath explained how he and his investors looked for "special situations" in which there were non-economic sellers of assets. He saw the opportunity to acquire Paradiso as such a special situation. There was no auction or other opportunity for CSE to obtain a market valuation of the assets. Of course, Mr. McGrath and Flatiron had the inside track regarding the valuation of the portfolio and Capital Source's motivations with respect to it because Mr. McGrath had been led to the investment by the former Capital Source employee responsible for it, Mr. Szwajkowski, who was planning to invest in the deal. The Court also credits Mr. McGrath's testimony that he was aware that Capital Source had balance sheet issues, and that they had ugly assets on their balance sheet following the 2008 recession that they wanted to clean up, making them potential non-economic sellers—and a rich opportunity for him.

The Court does not believe Mr. McGrath's testimony that Capital Source was pressured to consummate the Paradiso sale as a result of pressure related to their parent company's impending merger with Pac West. The employees in the Capital Source group testified credibly that they were unaware of the impending merger, and Mr. McGrath's testimony regarding the source of his market intelligence was exceedingly vague. Moreover, the PacWest merger was very large in dollar value—the Court does not have sufficient evidence to conclude that the sale of the Paradiso assets would move the needle in such a substantial transaction.

The Court will highlight several provisions from the Purchase Agreement that are important here. The Purchase Agreement provided that Flatiron was purchasing the equity interests of Paradiso "as is, where is and with all faults." The Purchase Agreement provides:

> THE EQUITY INTERSTS ARE SOLD "AS IS", "WHERE IS" AND "WITH ALL
> FAULTS," WITHOUT ANY REPRESENTATION, WARRANTY OR
> RECOURSE WHATSOEVER AS TO EITHER CONDITION, FITNESS FOR
> ANY PARTICULAR PURPOSE, MERCHANTABILITY OR ANY OTHER

WARRANTY, EXPRESS OR IMPLIED.   EXCEPT AS SET FORTH IN SECTIONS 4.1 AND 4.2, SELLER SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE EQUITY INTERESTS.

The Purchase Agreement incorporates by reference the Settlement Agreement.  It also contains an integration clause providing, among other things, that it "supersedes all prior documents, understandings, and agreements."

The Purchase Agreement also explicitly required that the "Buyer"—Flatiron—"shall give or cause to be given any notices legally necessary to be given, shall record any instruments legally necessary to be recorded and shall take all other actions necessary, in order to effect the transfer of title to and the servicing of the Assets pursuant hereto, including without limitation, the transfer of any third party servicing or custodial arrangements."  The Purchase Agreement also contained a "Further Assurances" provision that required the seller to use commercially reasonable efforts to "assist Buyer in a timely manner with . . . effectuating any legal notices, filings or similar actions regarding the transaction and/or the Buyer's ability to operate the Company following the Closing." If either seller or buyer "bring[s] a lawsuit against the other party for breach of such party's obligations under this Agreement, the losing party shall pay the prevailing party's costs and expenses incurred in connection with such litigation, including without limitation reasonable attorneys' fees."

### E.  Paradiso's New Owner Fails to Perform Under the Settlement Agreement

#### 1.   Initial Failure

##### i.   A Detour Regarding Paradiso's Counsel After the Sale

The Court will begin this section with a brief detour to discuss the role of Mr. Adams, Paradiso's local Tennessee counsel, after the sale of Paradiso closed.  Mr. Adams' representation of Paradiso was not terminated when the ownership of its equity changed hands.  Mr. Adams continued to represent Paradiso, and everyone involved knew that was the case.  The Court

highlights this because during trial, Plaintiffs continued to refer to Paradiso as "New Paradiso" to suggest that there was a new company and that Mr. Adams had to create a new client relationship with it.  He did not.

Mr. Adams continued to represent Paradiso after the transaction closed.  He appeared on their behalf in litigation following the closing.  He knew that Mr. Diaz was his point of contact for instructions and signatures from the new management of Paradiso, as illustrated by his emails to Mr. Diaz.  Mr. Adams also continued to represent and take instructions on behalf of CF and CI, which he also represented, from Ms. Choi.  After the court entered summary judgment in the Monroe County lawsuit, *Tellico Village Property Owners Ass'n, Inc. v. CS Paradiso Holdings, LLC, et al.*, Case No. 18941 (Monroe Cty. filed May 8, 2015) (the "2015 Monroe County Lawsuit") in 2017, Mr. Adams withdrew as counsel for Paradiso because Paradiso was considering filing suit against the sellers—his other clients.  At that point, Mr. Adams had a conflict and properly withdrew from his representation of Paradiso.  Up to that point, he represented Paradiso.

This is true notwithstanding the fact that he continued to take guidance from Ms. Choi, and that Ms. Choi had all of his invoices paid by CF and CI.  First, the Court finds that Ms. Choi was fully aware that she was not authorized to make decisions on behalf of Paradiso.  Her emails make clear that she knew that after the closing, Paradiso was responsible for its actions and that she could not have documents signed on its behalf or direct its representatives.  Ms. Choi did maintain a guiding hand in trying to fix a number of problems, as the Court will describe shortly, and she did have Mr. Adams' work on behalf of Paradiso paid from her clients' accounts.  But this was not malicious conduct, as suggested by Plaintiffs.  Instead, it was fully consistent with the obligations of "Seller" under Section 8.5 of the Purchase Agreement.  Ms. Choi took reasonable actions to assist Flatiron's execution of legal notices and filings.  That she worked in a manner consistent with that obligation does not support the conclusion that she was responsible for the mismanagement of

26

Paradiso's affairs.  Paradiso's new owners were responsible for its management after the sale.  Ms. Choi knew that Mr. Diaz was the point of contact for Flatiron and Paradiso after the deal closed and she worked to coordinate post-closing matters with him.

After the transaction, Jacoby Donner also represented Paradiso.  Mr. Diaz was aware that he and his firm represented Paradiso.  He knew the terms of the Settlement Agreement, and he was aware that Paradiso was required to satisfy certain post-closing conditions.

### ii.  Back to the Narrative

On August 7, 2013, Mr. Brabham emailed Mr. Adams to "follow up regarding the Exhibits." Mr. Brabham stated he understood that "the two (2) lists (labeled 'REO' and 'CFD Non-performing') totaling 276 lot descriptions you sent me" "comprise the Exhibit A 'Properties' to be conveyed per the Settlement Agreement."  This is indeed what the terms of the Settlement Agreement were.  He also informed Mr. Adams he needed "a list for Exhibit B to the Settlement Agreement sufficiently identifying the CFD rights assigned."  Mr. Brabham wanted underlying contract file information regarding the individuals who held the Non-Performing CFDs on the properties listed on Exhibit B so that the TVPOA could pursue collection of the outstanding payments.  He did not make this request because he was confused about the scope of the deal.  Mr. Brabham and Mr. Adams then worked to record the quitclaim deeds and lien releases.

Also on August 7, 2013, Mr. Diaz, as counsel for Flatiron and Paradiso, reached out to Ms. Choi asking for contact information for local counsel.  Ms. Choi gave Mr. Adams' contact information to Mr. Diaz.  She also noted that the quitclaim deeds for the Non-Performing CFDs and releases of the associated underlying mortgages were required to be delivered to the TVPOA by August 19, 2013, and were currently being prepared by Mr. Adams.  Mr. Diaz failed to contact Mr. Adams, despite the fact that he knew from the Settlement Agreement that the quitclaim deeds were required to be delivered in only twelve days.

On September 27, 2013, Mr. Adams emailed Ms. Choi, attaching the revised quitclaim deeds, releases of the deeds of trust, assignment of the CFDs, and a resolution of the transfers.  The attachments had been prepared by Mr. Brabham.  In his email to Ms. Choi, Mr. Adams noted that Mr. Brabham was "fussing about getting these done, but I let him know it's my fault."

On September 30, 2020, Mr. Adams followed up, asking for the executed version of the quitclaim deeds and releases.  Ms. Choi responded that except for the deed releases to be signed by CF, the rest needed to be signed by the new owners of Paradiso.  Ms. Choi correctly recognized that she did not have the authority to sign for Paradiso, which had a new owner.  She asked Mr. Adams to contact Mr. Diaz and walk him through this.  On October 1, 2020, Mr. Adams forwarded this email to Mr. Diaz.  Mr. Adams also left Mr. Diaz a voicemail, asking for Mr. Diaz to call him, so that Mr. Adams could provide Mr. Diaz more context regarding the content of his email.  Mr. Diaz again failed to respond.

On October 8, 2013, Mr. Adams sent Mr. Brabham the releases for the 16 Non-Performing CFDs.  But there was more that Paradiso had agreed to do under the Settlement Agreement.  Mr. Brabham instructed, correctly, that the "lists that comprise Ex[hibit] A to the Settlement Agreement" "should also be attached to the releases and the deeds."  In this, he was referring to the two lists—of REOs and Non-Performing CFDs—that he properly understood to comprise Exhibit A.  And everyone involved in the transaction—the TVPOA, Paradiso's former owners, Mr. McGrath, and Mr. Diaz all knew that was the deal—Paradiso had to transfer all but 24 properties to the TVPOA, and they had to release CF's liens over the properties so that they would have value for the TVPOA.

Mr. Brabham also asked Mr. Adams to let him know when he received the signed deeds, and reminded him that "time is of the essence."  Mr. Adams failed to respond.  On October 10, 2013, Mr. Brabham sent Mr. Adams an email with the subject "DEEDS," writing only,

"??????????????????????????"  Mr. Adams again failed to respond.  On October 14, 2013, Mr. Brabham again emailed Mr. Adams, expressing frustration as to the unexplained delays and threatening to file suit.  He wrote "I don't understand why it's so difficult to obtain delivery of a few signatures required by the Settlement Agreement (but my numerous prior emails and phone calls have apparently been unpersuasive in getting this done.)"  Again, Mr. Adams, Paradiso's counsel, did nothing.  Nor did Paradiso's other counsel, Mr. Diaz, despite the fact that he knew of the obligation, and had been forwarded the documents that needed to be signed on October 1, 2020.

### 2.  Paradiso Receives Notice of Default

On November 6, 2013, Mr. Brabham sent Mr. Adams a notice of default letter in Mr. Adams' capacity as counsel for CF and Paradiso.  The letter stated that the Settlement Agreement "requires (1) that [Paradiso] deliver the quitclaim deeds for the subject 276 properties, (2) that [CF] release its deed of trust lien against these properties, and (3) that [Paradiso] deliver the contemplated Contract for Deed Assignment, all by August 19, 2013."  The default letter advised that "[d]espite repeated verbal and written requests, [Paradiso] still hasn't delivered the properly executed deeds transferring title to the subject 276 properties to TVPOA's designee, and [CapitalSource Finance] still hasn't released its deed of trust lien against these properties as required.  Nor has [CapitalSource] executed the required Assignment of the non-performing Contract for Deeds."  Paradiso also failed to keep the assessment on the 24 Performing CFDs current as required by the Settlement Agreement.  Mr. Adams testified at trial that he believed that he had forwarded the notice to Ms. Choi, but the Court does not credit that testimony; it is also belied by later emails from Ms. Choi in which she asserted that she did not receive the notice.  Paradiso's counsel got this notice, but did not forward it to his clients.  It did provoke some action, however, albeit over a week later.

On November 14, 2013, Mr. Adams emailed Mr. Diaz again, forwarding his October 1, 2013 email.  Mr. Adams warned Mr. Diaz that "[w]e really need to get these quitclaim deeds and

assignments executed and delivered; TVPOA is threatening suit on this."  Mr. Diaz forwarded the email to his associate, Shana McMahon.  Mr. Diaz admitted "I may have missed something here," but wrote that he didn't recall Mr. Adams ever walking him through the process.  Mr. Diaz asked the associate to get in touch with Mr. Adams and to let him know what they needed to do.  Mr. Diaz knew that Ms. McMahon, to whom he was delegating this work, struggled with "timeliness," "follow-through," and "not being distracted by other things that might take priority when they shouldn't."  Ms. McMahon spoke to Mr. Adams on November 20, 2013 and reported to Mr. Diaz that she "confirmed that the spreadsheets he attached with the CFDs being transferred matched up to the exhibits to the TVPOA Settlement Agreement."

Here's where there was another disconnect—Mr. Adams may have been referring to the correct version of the Exhibit A—after all, he had recently communicated with Mr. Brabham about what should be included on Exhibit A.  The Court believes that it is more likely than not that Mr. Adams was referring to the 276 properties when he talked with Ms. McMahon.  But Ms. McMahon didn't know that.  She was the one person involved in the process who didn't know that the deal was to transfer 276 properties.  The Court believes that she pulled the version of the TVPOA Settlement Agreement that had been delivered to Flatiron by Mr. Steinberg in the JS Email, and used the Exhibit A attached to it to identify and attach the corresponding quitclaim deeds and releases.[3] As a result, the documents that she produced came up 16 shy.

Still, on November 20, Jacoby Donner was on the job.  Ms. McMahon told Mr. Diaz that she would send the documents to Mr. McGrath unless he wanted to review them first.  But then, somewhat astonishingly—but consistent with Mr. Diaz's observations regarding Ms. McMahon's work habits—nothing happened for over a month.  Ms. McMahon failed to send the documents to

---

[3] That process would require some work—remember that the exhibit listed 490 properties with 260 unique APNs.  If Ms. McMahon used that exhibit, she must have seen that there were 490 properties on the list and "solved" the problem by setting aside the duplicate entries—and undertaking no inquiry regarding the evident glitch in the exhibit.

Mr. McGrath, and Mr. Diaz failed to confirm whether she had done so. That lost month was important because the TVPOA had made it clear that they were likely not to file suit if the quitclaim deeds were transferred by the end of the year. Also, responsibility for payment of the annual assessments for the properties traveled with the deeds. So, if Paradiso could transfer the properties before year end, they would not be responsible for the payment of assessments—they would no longer be the record owner of the properties. But despite the substantial consequences—the threat of litigation, the annual assessments for the year, and their obligations under the Settlement Agreement—Jacoby Donner did nothing until the end of December.

On December 30, 2013, a paralegal at Jacoby Donner emailed Mr. McGrath, attaching the quitclaim deeds, assignment, and resolution, and asking Mr. McGrath to sign and overnight them back to Jacoby Donner for recording. Mr. McGrath's office returned the signed, but undated, documents to Jacoby Donner by email on January 9, 2014. The Court does not know why it took Mr. McGrath so much time to return the documents—but it was the holidays, after all.

Here something very troubling occurred. Jacoby Donner backdated the documents sent to them by Mr. McGrath. The Court infers that one of the lawyers at the firm instructed that to occur because of the importance of implementing the transfer before year end. The Court does not know if that was Mr. Diaz, Ms. McMahon, or both of them. The documents that Mr. McGrath had signed and returned undated by email transmitted on January 9, 2014, were dated December 23, 2013. By dating the documents December 23, 2013, Jacoby Donner and Paradiso could say that the properties had been transferred before year end—averting the increased assessments and perhaps avoiding a lawsuit. The notary, Mary Ellen Daley, attested that Mr. McGrath had appeared before her on December 23, 2013 to certify to the signature of the documents but that attestation was patently false. After all, the documents were not even transmitted to Mr. McGrath until December 30, 2020. Jacoby Donner and its paralegal, who was presumably acting under the direction of Mr.

Diaz and/or Ms. McMahon, presented falsified documents in order to cover up their delay in obtaining executed documents from Paradiso's signatory, Mr. McGrath.  This is extremely troubling, unethical conduct by the notary, whoever may have instructed the notary, and the Jacoby Donner firm.  Their willingness to engage in this kind of a falsification suggests that they were aware that their delay in getting the documents signed up was a real problem.  One that they needed to fix and cover up.

Inexplicably, despite the work to assemble these documents, and the effort to dissemble their date of execution, Paradiso did not forward the executed documents to the TVPOA's counsel, Mr. Brabham until March 19, 2014—over three months later.

### 3.  Lawsuits Ensue

On February 14, 2014, the TVPOA sued Paradiso, CF, and CI in Loudon County, Tennessee for breach of the Settlement Agreement and past due assessments.  *Tellico Vill. Prop. Owners Ass'n, Inc. v. CapitalSource, Inc., et al.*, Case No. 12198 (Loudon Cty. Filed Feb. 14, 2014) (the "2014 Loudon County Lawsuit").  A copy of the complaint was emailed to Ms. Choi on February 18, 2014.  It appears that she received it because her client had been served through CT Services.  Ms. Choi forwarded the complaint to Mr. Diaz by email on February 19, 2014, describing the allegations in the complaint, and noting that "[a]ll of the delinquent CFDs should have been transferred to TVPOA with only the 24 performing CFDs remaining in Paradiso so I'm not sure where this . . . is coming from.  They claim that a notice of default was sent on November 6, 2013 but I did not receive a copy of any such notice."

The complaint for the 2014 Loudon County Lawsuit forwarded by Ms. Choi attached a redacted version of the TVPOA Settlement Agreement that had been assembled by Mr. Brabham in support of the filing.  Critically, that Settlement Agreement contained different exhibits than those contained in the JS Email.  Unlike the JS Email's exhibits, they were clearly labelled with exhibit

stickers, not Mr. Steinberg's handwritten scrawl.  And the content of the exhibits was different than those attached to the JS Email—principally because its Exhibit A listed 276 properties, rather than the 490 included in the JS Email's variant.  Those differences were readily apparent—as was demonstrated effectively during the cross-examination of Mr. Diaz at trial.  Even a cursory review of this version of the Settlement Agreement would show the differences between its exhibits and those attached to the JS Email.  The Court believes that Jacoby Donner did not conduct such a cursory review; but they should have because the issue was at the heart of the lawsuit that now confronted their client.

On February 20, 2014, Mr. Choi, Mr. Adams, Mr. Sylvester, and Mr. Diaz had a conference call to discuss the lawsuit.  Although Mr. Diaz does not remember this call, email records show it was scheduled.  And the Court believes the witnesses who said it happened.  So, at that point, Paradiso knew that there was a lawsuit because of their failure to record the deeds.

Incredibly, however, despite the pending lawsuit, it took Jacoby Donner another month to send to Mr. Brabham the deeds that had been executed back in early January.  We know this because on May 20, 2014, Mr. Brabham wrote another letter to Mr. Adams.  In his letter, Mr. Brabham wrote Mr. Adams to ask about the status of Mr. Adams' clients' responses to his questions about the documents "all of which were first delivered to my office on the afternoon of March 19, 2014."  The Court believes that the documents were not delivered to him by Paradiso until that date.  No justification has been provided to explain that delay—the documents were sitting at Jacoby Donner.  The Court can comfortably find that the delay had nothing to do with the content of the JS Email, however.

In his May 20, 2014 letter, Mr. Brabham noted that the attachments Mr. Adams delivered were incomplete in that (1) the quitclaim deeds lacked the 16 Non-Performing CFDs; (2) the releases lacked the 16 Non-Performing CFDs; and (3) the assignments only included the 16 Non-

Performing CFDs.  In other words, the documents that Jacoby Donner had forwarded were still transferring only 260 properties despite the multitude of communications stating that 276 properties were to be transferred; and Messrs. McGrath and Diaz's knowledge that this was the deal.

On May 8, 2015, the TVPOA sued Paradiso, CF, and CI in Monroe County Tennessee for breach of the Settlement Agreement and for past due assessments.  That is because Paradiso had failed to keep current its assessments for the properties that it owned.  If Paradiso had effectuated the transfer of the properties timely to the TVPOA, it would not have been responsible for these assessments, because the properties would not have been owned by them.  So, this liability arose because of Paradiso's delay in filing the quitclaim deeds.  Mr. Brabham testified that there would have been no liability had the quitclaim deeds for the properties been delivered—these damages were not tied to CF's failure to file release documents because the assessment obligation traveled with ownership of the properties.

CF and CI retained Todd Presnell of Bradley, Arant, Boult Cummings LLP to represent them in the 2015 Monroe County Lawsuit.  Mr. Brabham's testimony was that it was the TVPOA's "position" that those entities were responsible for the past due assessments.  But, put simply, those entities were not liable for the past due assessments.  The Settlement Agreement made clear that CF and CI's obligation ended at the time that they no longer held an indirect interest in the equity interests of Paradiso—so their liability for those amounts under the Settlement Agreement terminated at the date of the sale.  The Court believes that Mr. Brabham knew that, but that he, as a competent lawyer, wanted to get as many people on the hook for the liability as possible, and took the "position" in the litigation that CF and CI, too, were responsible for the past due assessments to extract some additional value for his client.

In 2017, after the court granted summary judgment for the TVPOA in the 2015 Monroe County Lawsuit as to liability for the assessments that had accrued, Mr. Adams received a call from a

local lawyer asking if there was a conflict between him representing Paradiso and Paradiso asserting crossclaims against the Capital Source defendants.  Mr. Adams testified that was the first time the idea of raising a crossclaim was raised.  Mr. Adams promptly withdrew from his representation of Paradiso**.**

On March 20, 2017, the TVPOA entered into a settlement agreement with CF and CI, whereby the TVPOA agreed to dismiss the 2014 Loudon County Lawsuit and 2015 Monroe County Lawsuit, with prejudice, in exchange for a payment of $75,000, which was made on March 21, 2017. CF and CI also incurred $334,041.49 in attorneys' fees to defend the 2015 Monroe County Lawsuit. The TVPOA settled with Paradiso on April 11, 2017 for $250,000 to be paid in installments. Paradiso failed to pay the last $100,000 installment and as a result, had to pay an additional $80,000 to the TVPOA.

It was not until May 2017, years after the November 2013 default notice, that Paradiso finally delivered the required quitclaim deeds to the TVPOA.

In May 2017, Jacoby Donner, Mr. Diaz's old firm who handled the recording of the quitclaim deeds and lien releases, commenced a lawsuit against Aristone, Todd M. Lippiatt, and Mr. McGrath in the United States District Court for the Eastern District of Pennsylvania, *Jacoby Donner, P.C. v. Aristone Realty Cap., LLC*, 2:17-CV-02206-BMS (E.D. Pa. filed May 12, 2017), seeking payment of legal fees for its work on the Settlement Agreement and Purchase Agreement.  On July 6, 2017, Aristone, Mr. Lippiatt and Mr. McGrath answered the complaint and brought counterclaims alleging legal malpractice.  *Id.*

In the counterclaims, which the Court understands are still being litigated, Aristone described Jacoby Donner's failures in connection with their representation of Paradiso in connection with the resolution of the TVPOA Settlement Agreement.  Among the specific allegations in the counterclaims are that "Jacoby Donner did not execute and record the quitclaim deeds and lien

releases until September 2014, which breached the [] Settlement Agreement."  And "Aristone has incurred significant legal fees and costs and has been forced to pay settlement amounts due to Jacoby Donner's failure to execute and record the quitclaim deeds and lien releases by August 19, 2013 as required by the [] Settlement Agreement."[4]  So in another lawsuit, an affiliate of Plaintiffs here are alleging that Jacoby Donner is responsible for the damages that they are pursuing from Defendants in this action.  The Court understands why they have brought that claim.  But as the Court will explain more fully below, their negligent misrepresentation claim here has no merit.

The incorrect exhibit attached to the JS Email contributed to Paradiso's failure to timely record the quitclaim deeds as required under the Settlement Agreement.  The Court believes that the associates at Jacoby Donner—particularly Ms. McMahon—were relying on the version of the Settlement Agreement with the exhibits attached to the JS Email when they prepared a set of documents for Mr. McGrath to sign in late 2013.  The fact that the attachments to those quitclaim deeds showed 260 properties, rather than 276 was one of the reasons why the TVPOA rejected the filings.

But Paradiso cannot justify their failure to timely file the documents on the deficiency in the version of Exhibit A to the Settlement Agreement contained in the JS Email.  Mismanagement of Paradiso and what appears to the Court to have been bad lawyering by its representatives— particularly poor management and supervision of his team on Mr. Diaz's part—were the cause of the problem.  Exhibit A to the JS Email was a glitch—but for the mismanagement and lawyering, that glitch would not have metastasized.  Perhaps Mr. Brabham put it best in his testimony:  "I didn't know why it was causing the delay. . . . I didn't think there was any confusion.  That's why I was just baffled by what's taking them so long to [] get it to me, because they were making a second

---

[4] While Mr. McGrath and his company sued Jacoby Donner, Mr. Diaz's prior firm, they chose not to sue Mr. Diaz himself despite the fact that he was the lead partner responsible for guiding Jacoby Donner's work on the deal.  Unlike the targets of the counterclaims, Mr. Diaz is a high school friend of Mr. McGrath.

case for me by being boneheads."

There are many reasons why the Court draws this conclusion.  First, everyone, except, perhaps, for the associates at Jacoby Donner to whom implementation was delegated, knew the business terms of the deal.  Mr. Adams, Paradiso's lawyer, knew that Paradiso had to transfer 276 properties.  Mr. McGrath, the business person for Flatiron and Paradiso knew that.  Mr. Diaz knew that too.  They all knew that fact even before the sale of Paradiso.  The Court can understand why the error in the attachments JS Email might have caused the associates at Jacoby Donner to make a mistake.  But it was not reasonable for Paradiso and all of its representatives to continue to rely on the errant exhibit.  Paradiso's representatives collectively knew the deal.  A simple conversation with Mr. Adams or Mr. McGrath would have cleared up the problem—they knew that the deeds had to transfer 276 properties.  A minimally conscientious review by Mr. Diaz would have cleared up the problem.  Instead, lawyers at Jacoby Donner charged forward without checking in with their own client, Mr. Diaz, or Mr. Adams, who all knew what the deal was, to ascertain the source of the problem.  The Court does not know why this failure occurred—if it was because of the inadequacies of Ms. McMahon's lawyering, which had been noted by Mr. Diaz, or the inadequacy of Mr. Diaz's supervision of his team and negligence in management of the matter, or something else.  What is clear to the Court, however, is that Team Paradiso collectively had the information necessary to complete the work properly, and that Paradiso failed to communicate internally.

Moreover, Paradiso failed to take the simple expedient of talking with the TVPOA's representative, Mr. Brabham, despite his communications with them.  He knew the deal and had communicated his expectations in his November default notice and other communications with Mr. Adams.  Paradiso's counsel also acted with extreme lassitude.  Paradiso failed to transmit the backdated December 23, 2013 documents to the TVPOA until March 19, 2014.  Then they failed to communicate with Mr. Brabham about the issues with that submission in the ensuing months.  It

took them years to finally file the deeds.  The Court believes that the JS Email contributed to this problem, but that by itself it was a glitch capable of easy resolution.  It was mismanagement at Paradiso, and inadequate diligence by its counsel that caused Paradiso's failure to perform its obligations under the Settlement Agreement—and the resulting damages.

Plaintiffs commenced this action against Defendants on October 13, 2017.  Ultimately, they seek to place the responsibility for Paradiso's failure to comply with the known requirements of the Settlement Agreement over the course of years on Defendants.  But Paradiso's failure to perform resulted from mismanagement by its new owner, not misconduct by a representative of its prior owner.

## II.   DISCUSSION

To prevail on a negligent misrepresentation claim under Tennessee law, a plaintiff has the burden of proving his case by a "preponderance of the evidence."  *Williams v. Berube & Assocs.*, 26 S.W.3d 640, 644–45 (Tenn. Ct. App. 2000).  The burden of proving an affirmative defense is on the party asserting it.  *Tennessee Farmers Mut. Ins. Co. v. Farrar*, 337 S.W.3d 829, 837 (Ct. App. Tenn. 2009).

### A.  Negligent Misrepresentation Claim

Plaintiffs assert a claim for negligent misrepresentation.  TAC ¶ 53.  In its summary judgment decision, the Court concluded that Tennessee law applies to Plaintiffs' claims.  Mem. Op. & Order, Dkt No. 116 at 20.  The elements of a negligent misrepresentation claim under Tennessee law are:

> (1) the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; and (2) the defendant supplies faulty information meant to guide others in their business transactions; and (3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and (4) the plaintiff justifiably relies upon the information.

*Dixon v. Producers Agric. Ins. Co.*, 198 F. Supp. 3d 832, 837 (M.D. Tenn. 2016) (quoting

*Robinson v. Omer*, 952 S.W.2d 423, 427 (Tenn. 1997)).

### 1. Threshold Issues

Several threshold issues bar Plaintiffs' claims.  First, Paradiso does not have standing to

assert that Mr. Steinberg's statement constitutes a negligent misrepresentation because the statement

was not made to Paradiso.  Second, CSE is the only proper defendant here.  Most fatal, however, is

the fact that Plaintiffs' negligent misrepresentation claim is time-barred.

#### i. Standing

Under Tennessee law, liability for negligent misrepresentation claims is

> limited to loss suffered (a) by the person or one of a limited group of persons for
> whose benefit and guidance [the defendant] intends to supply the information or
> knows that the recipient intends to supply it; and (b) through reliance upon it in a
> transaction that [the defendant] intends the information to influence or knows that the
> recipient so intends or in a substantially similar transaction.

*John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 431 (Tenn. 1991) (quoting Restatement (Second)

of Torts § 552 (Am. Law Inst. 1977)); *see also Bethlehem Steel Corp. v. Ernst & Whinney*, 822 S.W.2d 592,

595 (Tenn. 1991).  A person to whom communication is not "directed at" "lacks standing to

pursue" a negligent misrepresentation claim.  *Solid Gold Casino Hotel & Resort of Tunica, Inc. v. Miles*,

No. 02-2863B, 2006 WL 721491, at *3 (W.D. Tenn. Mar. 21, 2006) (citation omitted).

Here, Plaintiffs argue that Defendants misrepresented the finality of the Settlement

Agreement exhibits on July 23, 2013 in order to induce Flatiron to enter into the Purchase

Agreement.  But on July 23, 2013, CSE, not Flatiron, owned Paradiso, which was the subject of the

transaction.  Mr. Steinberg's statement was made to Mr. Diaz, counsel for Flatiron.  So Flatiron has

standing to pursue a claim that the statement was a misrepresentation.  But the statements were not

made to or "directed at" Paradiso, which was a wholly owned subsidiary of the entity Mr. Steinberg

represented.  Mr. Steinberg was not making a representation of any sort to Paradiso.  Accordingly,

Paradiso lacks standing here.

Plaintiffs have argued that after Mr. Steinberg's July 23 email, Ms. Choi directed Mr. Adams to act on Paradiso's behalf.  But this Court has already ruled that only representations prior to Flatiron's purchase of Paradiso are relevant to the analysis of Plaintiffs' negligent misrepresentation claim.  Dkt No. 116 at n.16.  Moreover, the premise of this argument is factually incorrect.  Ms. Choi knew that she could not direct Paradiso after the sale closed.  She directed Mr. Diaz to Mr. Adams to have the pair connect regarding Mr. Adams' representation of Paradiso going forward. Mr. Diaz did not do that.  Mr. Diaz and the new owners of Paradiso were responsible for directing their representative.  They fell short on that front.  Ms. Choi's communications with Mr. Adams in working to resolve the 2014 lawsuit were not directions to Mr. Adams on behalf of Paradiso, but, rather on behalf of her own client to solve a common problem.  At that point, Mr. Adams was representing both Paradiso and the Capital Source entities.  To the extent that she discussed with Mr. Adams and Mr. Diaz issues related to the quitclaim deeds, her conduct was reasonable and consistent with the "Further Assurances" obligations of her client as seller under the Purchase Agreement.  If there was a vacuum regarding the direction of Mr. Adams' representation of Paradiso, that was not the consequence of malfeasance by the seller, but, rather, negligence by its new owner.

Plaintiffs' creative theory that the representation regarding the content of the JS Email was made to Paradiso itself has no merit.  Plaintiffs pursue this flawed theory so that they can argue that Paradiso's flummoxing inability to record the deeds was because it relied on the content of the JS Email to identify the properties to be transferred.  This theory is flawed for many reasons.  First, again, the representation was not made to Paradiso; Paradiso was the target of the acquisition.  And there is no way to read the Purchase Agreement, with its integration clause, to imply any representation to the company being sold.  Second, Paradiso's representatives and principals after the sale knew the content of their deal with the TVPOA—they could not reasonably believe that

their obligation was limited to a transfer of 260 properties.  Third, as described above, the JS Email

contributed to Paradiso's failure to comply timely with its obligations, but it did not cause the

ultimate harm—that was the result of intervening negligent conduct by Paradiso's managers and

attorneys.

### ii.   CSE Is the Only Proper Defendant

CSE was the seller of Paradiso; CF and CI were not.  The Purchase Agreement was among

CSE and CS Commercial, as "Seller" and Flatiron as "Buyer."  CF and CI were not parties to the

Purchase Agreement.  CSE retained Mr. Steinberg of Holland & Knight LLP, formerly of Patton

Boggs LLP, as counsel to negotiate the transaction on behalf of CSE as the seller.  Mr. Steinberg did

not represent either CF or CI in Flatiron's acquisition of Paradiso as neither CF nor CI were parties

to the transaction.  His statement in the JS Email was not made on their behalf.  Accordingly, CF

and CI are not proper defendants and cannot be held liable on the negligent misrepresentation

claim.

### iii.   Statute of Limitations

Plaintiffs' claims are barred by the statute of limitations because they were on inquiry notice

of the issues that they have identified regarding the JS Email.  In Tennessee, "[t]he statute of

limitations for negligent misrepresentation is three years from the accruing of the cause of action."

*Med. Educ. Assistance Corp. v. State ex rel. E. Tenn. State Univ. Quillen Coll. of Med.*, 19 S.W.3d 803, 817

(Tenn. Ct. App. 1999) (citing *City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d 729, 735 (Tenn.

Ct. App. 1996), *perm. app. denied* (Tenn. 1997)).  "A cause of action accrues . . . when a plaintiff

discovers, or in the exercise of reasonable care and diligence, should have discovered, his injury and

the cause thereof." *Id.* (citation omitted).  "The statute is tolled only during the period when the

plaintiff has no actual or constructive knowledge of the alleged wrong." *Ne. Knox Util. Dist. v.

Stanfort Constr. Co.*, 206 S.W.3d 454, 459 (Tenn. Ct. App. 2006) (citing *City State Bank*, 948 S.W.2d at

735).

"Constructive or 'inquiry' notice occurs 'when the plaintiff has actual knowledge of facts sufficient to put a reasonable person on notice that he or she has suffered an injury as a result of wrongful conduct.'" *Robinson v. Baptist Mem'l Hosp.*, 464 S.W.3d 599, 608 (Tenn. Ct. App. 2014) (quoting *Redwing v. Cath. Bishop for Diocese of Memphis*, 363 S.W.3d 436, 459 (Tenn. 2012) (internal quotation omitted)).  Inquiry notice "charges a plaintiff with knowledge of those facts that a reasonable investigation would have disclosed.  Once a plaintiff gains information sufficient to alert a reasonable person of the need to investigate the injury, the limitation period begins to run." *Redwing*, 363 S.W.3d at 459 (internal quotation marks, ellipsis, and brackets omitted) (quoting *Sherrill v. Souder*, 325 S.W.3d 584, 594 (Tenn. 2010)).

The only statement at issue here—Mr. Steinberg's email to Mr. Diaz stating that the Settlement Agreement was finalized—was made on July 23, 2013.  The statute of limitations, absent tolling, ran three years later, on July 23, 2016.  Plaintiffs contend that they were unaware of the alleged wrong until the start of discovery in this case.  But there were at least three separate instances before discovery commenced that put Plaintiffs on inquiry notice that there was a problem with Exhibit A to the Settlement Agreement contained in Mr. Steinberg's email.

First, prior to July 23, 2013, Flatiron was informed that Paradiso was the record owner of 300 lots in Tellico Village.  And Flatiron was also repeatedly informed that the terms of the Settlement Agreement required Paradiso to convey the REOs and Non-Performing CFDs, and that Paradiso would maintain the 24 Performing CFDs.  But if Mr. Diaz had given the Exhibit A attached to Mr. Steinberg's July 23, 2013 email even a cursory glance, he would have seen that Exhibit A appeared to show 490 lots.  A reasonable person who, having been informed that Paradiso was the record owner of 300 lots and seeing 490 lots on Exhibit A would have sufficient information to consider that there might have been issues with the accuracy of Exhibit A.  Mr. Diaz

42

and Mr. McGrath knew that 276 lots were to be transferred.  Additionally, Mr. Diaz testified that he noticed that the labels to the exhibits were handwritten, and that he thought this was "a bit odd." These facts were sufficiently curious or suspicious to require a reasonable person to investigate further.  Mr. Diaz, Paradiso's counsel, did not do so.

Paradiso also had inquiry notice of the issues with the exhibits on November 6, 2013, when Mr. Brabham sent Mr. Adams the notice of default demanding the 276 lots and noting that Paradiso had not maintained assessments on the 24 Performing CFDs.  Mr. Adams was Paradiso's lawyer. And a few days later, Mr. Adams told Mr. Diaz, "we really need to get these quitclaim deeds and assignments executed and delivered; TVPOA is threatening suit on this."  Accordingly, Paradiso and Flatiron were on inquiry notice and became aware of potential issues with the exhibits at that time.

There is no question that Paradiso and Flatiron were on inquiry notice of the issues with the exhibit on February 14, 2014, when the TVPOA filed the 2014 Loudon County lawsuit  And Ms. Choi and Mr. Adams notified Mr. Diaz—attorney for both Flatiron and Paradiso—of this.  The TVPOA's complaint in the 2014 Loudon County Lawsuit listed the 276 Tellico Lots that had to be conveyed to the TVPOA.  Compl., *Tellico Vill. Prop. Owners Ass'n, Inc. v. CapitalSource, Inc., et al.*, Case No. 12198 (Loudon Cty. Filed Feb. 14, 2014).  The exhibits to the Settlement Agreement attached the complaint are different from those attached to the JS Email.  A reasonable person faced with this information would, at the very least, have inquired about the Settlement Agreement exhibits at this time.  So at the latest, the statute of limitations for Paradiso's negligent misrepresentation claim ran three years later, on February 14, 2017—many months before Plaintiffs asserted their negligent misrepresentation claim.  Accordingly, Plaintiffs' negligent misrepresentation claim is time-barred.

### 2.   Plaintiffs Have Failed to Prove a Claim for Negligent Misrepresentation

Even if Flatiron were not barred by the statute of limitations, Flatiron has not proven by a preponderance of the evidence that the statement made by Mr. Steinberg in his email to Mr. Diaz

late in the evening on July 23, 2013 constituted a negligent misrepresentation by CSE.

### i. Against "a supplier of information to be used in commercial transactions"

Liability for negligent misrepresentation is limited to "a supplier of information to be used in commercial transactions." *Hodge v. Craig*, 382 S.W.3d 325, 344–45 (Tenn. 2012) (quoting Restatement (Second) of Torts § 552 cmt. a (Am. Law Inst. 1977)). "[T]he requirement that the misrepresentation be made to guide others in their business transactions" is "an essential element of a negligent misrepresentation claim." *Id.* at 345 (quoting *Robinson v. Omer*, 952 S.W.2d at 428) (internal quotation marks omitted).

The supplier of information must be "act[ing] with actual or apparent authority" when the statement was made. *Schauffert v. Certain Underwriters at Lloyd's London*, No. 3:09-0510, 2009 WL 5205392, at *9 (M.D. Tenn. Dec. 23, 2009). "Generally, to prove apparent agency one must establish (1) the principal actually or negligently acquiesced in another party's exercise of authority; (2) the third person had knowledge of the facts and a good faith belief that the apparent agent possessed such authority; and (3) the third person relied on this apparent authority to his or her detriment." *White v. Methodist Hosp. S.*, 844 S.W.2d 642, 646 (Tenn. Ct. App. 1992) (citations omitted). "Apparent authority is established through the acts of the principal rather than those of the agent or through the perception of a third party." *Boren ex rel. Boren v. Weeks*, 251 S.W.3d 426, 433 (Tenn. 2008) (citing *Bells Banking Co. v. Jackson Ctr.*, 938 S.W.2d 421, 424 (Tenn. Ct. App. 1996)).

The Court has found that Mr. Steinberg made a statement to Mr. Diaz regarding the settlement agreement with the TVPOA. CSE and Mr. Steinberg as CSE's attorney, were suppliers of information to be used in the transaction whereby Flatiron acquired Paradiso. Flatiron closed on the acquisition of Paradiso's assets "[o]nly after receiving word of the JS Email and that the [Settlement Agreement] and exhibits were all final." As CSE's attorney in this transaction, Mr. Steinberg acted with actual or apparent authority when the statement was made. As Flatiron made

clear through repeated emails sent by Mr. Diaz's paralegal regarding the finalization of the Settlement Agreement and the exhibits, Flatiron required this information to proceed with the transaction.  And immediately after receiving this information, Mr. Diaz released the signature pages for the Purchase Agreement.  So Flatiron's evidence would be sufficient to prove the first element of its negligent misrepresentation claim.

### ii.   Defendant supplies faulty information

The second element is that the defendant "supplies faulty information meant to guide others in their business transactions." *Producers Agric. Ins. Co.*, 198 F. Supp. 3d at 837 (quoting *Robinson v. Omer*, 952 S.W.2d at 427.  This requires "that the statements at issue must be false (*i.e.*, faulty) when made." *W. Silver Recycling, Inc. v. ProTrade Steel Co., LTD.*, No. 3:18-CV-00710, 2020 WL 4501458, at *11 (M.D. Tenn. Aug. 5, 2020) (citation omitted).  The faulty information must "consist of a statement of a material past or present fact." *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982) (citations omitted).  "[T]ypographical mistakes and other . . . *de minimis* errors do not invalidate the [Contract] itself." *LNV Corp. v. Gebhardt*, No. 3:12-CV-468-TAV-HBG, 2014 WL 1092109, at *4 (E.D. Tenn. Mar. 18, 2014) (citing *Philpot v. Tenn. Health Mgmt., Inc.*, 279 S.W.3d 573, 579 (Tenn. Ct. App. 2007).

Mr. Steinberg stated that his email attached a "fully-compiled, fully-executed settlement agreement."  The statement that the attached Settlement Agreement was "fully-executed" is true.  All parties to the Settlement Agreement had lists of the properties, including the 260 REOs, 16 Non-Performing CFDs, and 24 Performing CFDs.  There was a meeting of the minds as to the terms of the deal, and the deal was enforceable.

But Flatiron has shown that Mr. Steinberg's statement that a "fully-compiled" settlement agreement was "attached" is false.  Mr. Steinberg mislabeled the content of Exhibit A, as the Court has already described.  Flatiron is correct that the properties listed in the attachments to Mr.

45

Steinberg's July 23, 2013 email to Mr. Diaz were not the finalized exhibits, because there were no

finalized exhibits in this "fast and loose" deal.  The lawyers involved in the Settlement Agreement—

Mr. Adams and Mr. Brabham—never compiled a version of the agreement with the exhibits

attached.  And the Exhibit A that was attached to the JS Email did not match the description of

Exhibit A in the Settlement Agreement.  Accordingly, Flatiron has met its burden in proving the

false statement element of its negligent misrepresentation claim.[5]

### iii.  Reasonable care

The third element is that "the defendant fails to exercise reasonable care in obtaining or

communicating the information."  *Producers Agric. Ins. Co.*, 198 F. Supp. 3d at 837 (quoting *Robinson v.

Omer*, 952 S.W.2d at 427.  "An attorney practicing in Tennessee . . . must exercise the ordinary care,

skill, and diligence commonly possessed and practiced by attorneys throughout the state."  *Chapman

v. Bearfield*, 207 S.W.3d 736, 740 (Tenn. 2006) (emphasis omitted).

Here, Flatiron has failed to meet its burden.  Mr. Steinberg acted with reasonable care in

---

[5] Plaintiffs made arguments at trial suggesting that the Settlement Agreement may not have been enforceable.  It is just as well that this issue was not soundly placed before the Court here, because there is no basis to conclude that the Settlement Agreement was not enforceable.  The agreement's enforceability is confirmed by the conduct of the parties— the TVPOA dismissed the 2010 Loudon County Lawsuit in reliance on it.  And the parties litigated the subsequent cases based on the unchallenged premise that the document was enforceable.  Clearly, the parties to the Settlement Agreement mutually understood its terms.  There was a disconnect between the parties regarding the proper content of Exhibit A. But that minor mistake would not make the contract unenforceable.

> A "mistake" exists in a legal sense when a person, acting on an erroneous conviction of law or fact, executes an instrument that he or she would not have executed but for the erroneous conviction.  "A court may not rescind a contract for mistake unless the mistake is innocent, mutual, and material to the transaction and unless the complainant shows an injury."  In order for relief to be granted on the grounds of mistake, the mistake must have been: (1) mutual or fraudulent; (2) material to the transaction; (3) not due to the complainant's negligence; and (4) the complainant must show injury.

*Gibbs v. Gilleland*, No. M2015–00911–COA–R3–CV, 2016 WL 792418, at *7 (Tenn. Ct. App. Feb. 29, 2016) (internal citations omitted).

The mistake here—again that Exhibit A should have contained both the REO and the Non-Performing CFD list, rather than just the REO list—was not a mistake that would permit the Court to rescind the agreement. First, the mistake was not mutual or fraudulent.  Mr. Brabham clearly understood the proper content of Exhibit A, so it was not mutual.  There is no evidence that the mistake was fraudulent.  Most importantly, the mistake was not material.  All sides knew that a total of 276 properties were to be transferred.  The mistake was not material to the transaction.  It was a glitch; one that became a problem only due to the inattention of Paradiso after the closing of the transaction.

obtaining and communicating information regarding the Settlement Agreement.  Mr. Steinberg was

not involved in the negotiation of the Settlement Agreement, and did not know what the exhibits to

the Settlement Agreement consisted of.  So he reasonably reached out to people at the client—Ms.

Choi, Mr. Sylvester, and Mr. Adams—to find out, asking if they had "a copy of the settlement

agreement with the exhibits attached."  Mr. Steinberg testified that it was his usual practice to ask

clients for information about which properties were to be attached in schedules to a deal.

Could Mr. Steinberg have asked his clients a better, more specific question?  Certainly.  He

could, for instance, have asked if they had a copy of the fully executed Settlement Agreement with

*finalized* exhibits attached rather than asking if they had "a copy of the settlement agreement with the

exhibits attached."  He might have waited until the next day, by which time Mr. Adams, who had

negotiated the agreement, might have responded.  But Mr. Steinberg asked a perfectly adequate

question and reasonably relied on his client's answer.  Mr. Steinberg was not charged with

interpreting the language of the Settlement Agreement to see what Exhibit A should have been; he

was compiling a document that he understood from his clients to exist.  There is not sufficient

evidence for the Court to conclude that he acted in a manner inconsistent with the standard of care.

Mr. Steinberg did make a scanning error, inadvertently duplicating the list of Loudon County

REOs included in his version of Exhibit A.  Perhaps a lawyer exercising ordinary care would have

reviewed the exhibits prior to sending the email to Mr. Diaz, and would have caught that scanning

error.  But this scanning error was not material and it was the only failure of Mr. Steinberg.

Otherwise, the steps that he took to collect the Settlement Agreement and to append the exhibits

have not been proven to fall below the proper standard of care.

### iv.  Justifiable reliance

Finally, the plaintiff must prove that it justifiably relied upon the alleged misrepresentation.

"Justifiable or reasonable reliance involves two different issues:  whether the plaintiff actually relied

on the misrepresentation and whether that reliance was reasonable." *Pritchett v. Comas Montgomery Realty & Auction Co.*, No. M2014-00583-COA-R3-CV, 2015 WL 1777445, at *3 (Tenn. Ct. App. Apr. 15, 2015) (citation omitted); *see also Williams*, 26 S.W.3d at 645; *see also Metro. Gov't of Nashville & Davidson Cnty. v. McKinney*, 852 S.W.2d 233, 238 (Tenn. Ct. App. 1992) ("[T]he burden is upon the plaintiff to show that its reliance upon any statements defendants may have made was reasonable.").

"Justifiable reliance in this context is *not* blind faith." *McNeil v. Nofal*, 185 S.W.3d 402, 408 (Tenn. Ct. App. 2005) (emphasis in original). "Generally, a party dealing on equal terms with another is not justified in relying upon representations where the means of knowledge are readily within his reach." *Solomon v. First Am. Nat'l Bank of Nashville*, 774 S.W.2d 935, 943 (Tenn. Ct. App. 1989) (citation omitted). If "the means of information are at hand and equally accessible to both parties so that, with ordinary prudence or diligence, they might rely on their own judgment, generally they must be presumed to have done so, or, if they have not informed themselves, they must abide the consequences of their own inattention and carelessness." *Haynes v. Lunsford*, No. E2015-01686-COA-R3-CV, 2017 WL 446987, at *8 (Tenn. Ct. App. Feb. 2, 2017) (quoting *McNeil v. Nofal*, 185 S.W.3d 402, 409 (Tenn. Ct. App. 2005)); *accord Winstead v. First Tenn. Bank N.A.*, 709 S.W. 2d 627, 633 (Tenn. Ct. App. 1986). "Factors . . . to use in considering a plaintiff's justifiable reliance include '(1) the plaintiff's business expertise and sophistication; (2) the existence of a longstanding business or personal relationship between the parties; (3) the availability of relevant information; (4) the existence of a fiduciary relationship; (5) the concealment of fraud; (6) the opportunity to discover fraud; (7) which party initiated the transaction; and (8) the specificity of the misrepresentation.'" *Moore v. It's All Good Auto Sales, Inc.*, 907 F. Supp. 2d 915, 938 (W.D. Tenn. 2012) (quoting *Riddle v. Lowe's Home Centers, Inc.*, 802 F.Supp.2d 900, 908 (M.D. Tenn. 2011)).

Here, even if Flatiron had proven that the JS Email met all of the other required elements of a negligent misrepresentation claim, Flatiron has failed to prove that they reasonably relied on the JS

Email.  Because even if the exhibits attached to the JS Email were not exactly right, what Flatiron

and Mr. McGrath understood and signed off on was the substance of the deal—that Paradiso, CF,

CI, and the TVPOA had entered into a Settlement Agreement on the terms that had been previously

and repeatedly communicated to Mr. McGrath.  This is what Flatiron relied upon.  And it remained

unchanged despite the imperfect exhibits in the JS Email.

Mr. McGrath has made it clear that the finalization of the Settlement Agreement was what

mattered to Flatiron.  *See, e.g.*, McGrath Decl. ¶ 18 ("Flatiron would not go forward with the

purchase while the TVPOA Litigation and the underlying dispute remain unresolved[.]"); *id.* ¶ 20

("Flatiron was willing to close on the purchase of Paradiso, provided Paradiso either resolved the

TVPOA Litigation or the parties agreed to a hold-back on the agreed-upon purchase price."); *id.*

¶ 21 ("[A] final resolution as to the Tennessee Litigation was critical to Flatiron[.]"); *id.* ¶ 23 ("I

know that had Flatiron been informed that the settlement agreement with the TVPOA had not been

fully and finally agreed upon—including the exhibits listing the properties and rights to be

transferred—Flatiron would not have closed on the purchase under the existing deal points and

contract."); *id.* ¶ 37 ("[I]t was important to Flatiron to have certainty and finality as to which

properties were retained by Paradiso and the transfer of properties and rights to the TVPOA (in

order to avoid payment of penalties in regard to past problems and also to avoid any problems in

the future).").

But the Settlement Agreement *was* consummated and enforceable when Mr. Steinberg sent

his July 23, 2013 email.  This enforceability was what Flatiron relied upon in entering into the

Purchase Agreement.  On July 23, 2013, all parties to the Settlement Agreement—CF, CI, Paradiso,

and the TVPOA—had the lists of properties: 260 REOs, 16 Non-Performing CFDs, and 24

Performing CFDs.  This was the same deal that Mr. McGrath had already agreed to.  On July 18,

2013, Mr. Sylvester sent Mr. McGrath the "current version of settlement agreement" as "agreed to

by the [TV]POA."  Mr. Sylvester's email included in the text the substance of Section 1 of the

Settlement Agreement, listing Paradiso's obligations prior to signature.  Mr. McGrath replied that

"[s]ubject to legal signing off [he] was fine with" the current version of the Settlement Agreement.

The next day, on July 19, 2013, Paradiso, CF, and CI signed the Settlement.  The Court simply does

not find it credible that Mr. McGrath was relying on the correctness of the content of Exhibit A

attached to Mr. Steinberg's email in entering into the Purchase Agreement.  As noted above, the

Purchase Agreement does not contain a representation regarding the accuracy or completeness of

the documents provided in Schedule C.

And even if Flatiron did rely on the mistaken attachment to Mr. Steinberg's July 13, 2020

email, such reliance was not reasonable.  Plaintiffs are sophisticated parties.  Mr. McGrath was

informed by Mr. Sylvester that Paradiso owned 300 Tellico Lots that were at issue in the 2010

Loudon County lawsuit.  Mr. McGrath was sent and had access to the Master List of Paradiso's

properties.  Mr. McGrath was informed that Paradiso needed to convey the REOs and Non-

Performing CFDs to the TVPOA.  He was expressly told that Paradiso was retaining 24 Performing

CFDs and Flatiron needed to keep the assets current after taking over Paradiso.  If, indeed, Mr.

Diaz's firm did rely on the attachments to the JS Email without thought because, as Mr. Diaz

testified, Mr. Steinberg was from a "reputable firm," such reliance is inherently unreasonable.  This

is the very definition of blind faith, and reasonable reliance is not blind faith.

### v.  Fraudulent or intentional misrepresentation

Plaintiffs also attempt to assert claims for fraudulent or intentional misrepresentation.  But

because Plaintiffs fail prove a claim for negligent misrepresentation, they cannot possibly prove a

claim for fraudulent or intentional misrepresentation.  *See Walker v. Sunrise Pontiac-GMC, Inc.*, 249

S.W.3d 301, 311 (Tenn. 2008) ("In order to prove a claim based on fraudulent or intentional

misrepresentation, a plaintiff must show that:  1) the defendant made a representation of an existing

or past fact; 2) the representation was false when made; 3) the representation was in regard to a material fact; 4) the false representation was made either knowingly or without belief in its truth or recklessly; 5) plaintiff reasonably relied on the misrepresented material fact; and 6) plaintiff suffered damage as a result of the misrepresentation.") (quoting *McKinney*, 852 S.W.2d at 237).

### B. Damages

#### 1. Flatiron Is Not Entitled to Punitive Damages

Tennessee law provides that a Court may award punitive damages if it finds that defendant has acted either intentionally, fraudulently, maliciously, or recklessly. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). Here, Flatiron has failed to show that Defendants acted intentionally, fraudulently, maliciously, or recklessly. *See supra.* Accordingly, Flatiron is not entitled to punitive damages.

#### 2. Flatiron Has Not Proven Damages Under Either 552B or the Benefit of the Bargain Rule

Plaintiffs are correct that Tennessee courts apply the benefit of the bargain rule in calculating damages for negligent misrepresentation. *See, e.g.*, *Rose v. City of Covington*, 634 S.W.2d 268, 269 (1982) (applying the benefit of the bargain rule); *Dixon v. Chrisco*, No. M2018-00132-COA-R3-CV, 2018 WL 4275535, at *7 (Ct. App. Tenn. Sept. 7, 2018) ("In an action for damages caused by fraudulent misrepresentation, the proper measure of the plaintiffs' general damages is the benefit of the bargain rule.") (quoting *Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228, 233 (Tenn. Ct. App. 1976); *Muesing v. Ferdowsi*, No. 01-A-019005CV00156, 1991 WL 20403, at *6 (Ct. App. Tenn. Feb. 21, 1991) ("Tennessee measures damages for misrepresentation using the 'benefit of the bargain' rule that permits injured parties to recover the difference between the actual value of the property and the value it would have had if it had not been misrepresented.").

But Defendants are correct that Tennessee courts sometimes apply or cite to Section 552B of the Restatement (Second) of Torts ("Section 552B" or "552B") in calculating such damages. *See,*

*e.g.*, *Producers Agriculture Ins. Co.*, 198 F. Supp. 3d at 841 (quoting Section 552B and reasoning that to succeed on their negligent misrepresentation claim, "Plaintiffs must have suffered a pecuniary loss")); *Zander v. Katz, Sapper & Miller, LLP*, 25 F.Supp.3d 1055, 1067 (M.D. Tenn. 2014) ("While Tennessee courts may apply the benefit-of-the-bargain rule to actions for negligent misrepresentation, they are 'not required' to do so 'mechanically in every misrepresentation case.'") (quotations omitted).

Despite the fact that Tennessee courts seem to calculate damages under both the benefit of the bargain rule and 552B, the Tennessee Supreme Court has never ruled that 552B is the appropriate formula for damages in a negligent misrepresentation claim.  Absent a clear showing that the Tennessee Supreme Court has overruled its previous cases stating that the benefit of the bargain rule is the proper way to calculate damages, the Court will follow the benefit of the bargain rule.  Plaintiffs fail to prove their damages under the benefit of the bargain rule.  And if the Tennessee Supreme Court were to apply 552B, Plaintiffs have failed to prove any damages under that rule as well.

### i.  Flatiron has not proven damages under the benefit of the bargain rule

The benefit of the bargain rule calculates damages as "the difference between the actual value of the property received at the time of the making of the contract as compared to the value if the representations had been true."  *Rainey v. Binkley*, No. 3:16-CV-03293, 2018 WL 1697786, at *5 (M.D. Tenn. Apr. 6, 2018) (citing *Faerber v. Troutman & Troutman, P.C.*, No. E2016–01378–COA–R3–CV, 2017 WL 2691264, at *9 (Tenn. App. Jun. 22, 2017)); *see also Cary v. Evans*, 1986 WL 6642, at *3 (Tenn. Ct. App. Jun. 12, 1986); *Haynes*, 546 S.W.2d at 233 (applying the benefit of the bargain rule in calculating damages to claim of fraudulent misrepresentation).  "The plaintiff has the burden of proving both values applied in the formula which measures his general damages, the actual value of the property at the time of the contract and the value of the property if it had been as it was

represented to him." *Haynes*, 546 S.W.2d at 233–34.  "Without proof of damages, there can be no

award of damages." *Flatford v. Williams*, Knox Chancery, C.A. No. 1201, 1989 WL 4419, at *2 (Tenn.

Ct. App. Jan. 24, 1989) (citing *Inman v. Union Planters Nat'l Bank*, 634 S.W.2d 270, 272 (Tenn. Ct.

App. 1982)).

Here, Plaintiffs have not proven the "actual value" of Paradiso and its assets.  Plaintiffs have

presented evidence regarding the purchase price of Paradiso, but in this case, that evidence alone is

insufficient to establish the "actual value" of Paradiso.  Mr. McGrath provided a very clear

explanation of his focus on investing in "special situations"—finding non-economic sellers who

would sell assets at a valuation below the economic value of the assets.  According to Mr. McGrath,

CSE was such a non-economic seller—they wanted to dump a portfolio of bad loans to improve

their balance sheet.  As the Court noted above, Mr. McGrath and Flatiron had the inside track

regarding the valuation of the portfolio and Capital Source's motivations with respect to it because

Mr. McGrath had been led to the investment by the former Capital Source employee responsible for

the portfolio and who was planning to invest in the deal.  There were no competing offers, no

auctions, or any other opportunities for CSE to obtain a market valuation of the assets.

The eventual price paid by Flatiron was based on an algorithm that took into account the

aggregate outstanding principal of performing loans (as of June 30, 2013) multiplied by 0.32475.

The undiscounted value of the performing loans was $9,568,309.75.  The total outstanding balance

of Paradiso's loan portfolio, including non-performing loans, as shown in the Master List as of

December 31, 2012 was $59,792,744.  The purchase price was calculated as if the entire portfolio of

Paradiso's non-performing loans was zero—even though those loans were secured with real

property—in some cases, such as the Tellico Village Properties and other CFDs, real property

directly owned by Paradiso.  The purchase price for Paradiso also ascribed no value to the 3,489

REOs owned by Paradiso—parcels of real property not associated with a contract for deeds or a

standard mortgage financing.  Although Flatiron paid nothing for those assets in Paradiso's portfolio, there is evidence in the record of this case that supports the common sense proposition that an unencumbered piece of real property has some value.  After all, the TVPOA agreed to take a portfolio of properties owned by Paradiso as valuable consideration for their resolution of the 2010 Loudon County Lawsuit.

Under these circumstances, the Court does not find that Plaintiffs have proven the "actual value" of Paradiso.  In most cases, the purchase price of an asset would equate to its to value, but here there are substantial indications that the "actual value" of the portfolio acquired with Paradiso of over $59,000,000 in loans secured by real properties, over $9,000,000 of which were performing, *and* 3,489 REOs was greater than the $3,107,308.59 paid by Flatiron.  That was Mr. McGrath's business, after all—to buy assets in special situations for less than their actual value.  And there is ample evidence that, in that, he succeeded.  Plaintiffs' reliance on evidence of the purchase price of Paradiso alone is not sufficient in this case to meet their burden to prove Paradiso's actual value.

Plaintiffs have also not proven the discounted actual value of Paradiso as a result of the asserted misrepresentation.  Plaintiffs point to evidence of the discount that Mr. McGrath would have sought to the purchase price for Paradiso if the 2010 Loudon County Lawsuit had not been resolved prior to the sale as the basis for the discounted actual value of Paradiso as a result of the alleged misrepresentation.  This argument is fundamentally flawed for a very simple reason.  The discounted price suggested by Mr. McGrath was the amount that he would have requested if the 2010 Loudon County Lawsuit had not been settled before the closing of the deal.  But the lawsuit was settled—the Settlement Agreement was entered into and the lawsuit was dismissed at the time that the purchase was consummated.  Plaintiffs have not presented evidence regarding the amount of any difference in the valuation of Paradiso as a result of the asserted misrepresentation in the JS Email.  The amount of a discount that Flatiron would have sought in the absence of a settlement of

the lawsuit is not a proxy for the effect of the alleged misrepresentation in the JS Email.  They are

apples and oranges.

So Plaintiffs have not proven that the further discounted price Plaintiff proposed (which was

never agreed upon) in the event that the litigation against Paradiso was not resolved was the "actual

value" of the property received at the time of the Purchase Agreement.  Plaintiffs also have not

proven the "actual value" of the property if the representations had been true.  And Plaintiffs have

not proven the difference between those two actual values.  Accordingly, Plaintiffs have not proven

damages under the benefit of the bargain rule.

### ii.   Flatiron Has Not Proven Damages Under 552B

Plaintiffs have also not proven damages under the alternative damages theory promoted by

Defendants.  Defendants argue that to recover, Flatiron must "show that [they] suffered a pecuniary

loss as a result of relying on the misrepresentation."  *Parks v. Fin. Fed. Sav. Bank*, 345 F. Supp. 2d

889, 894 (W.D. Tenn. 2004).  Even though the Court has found that the Tennessee Supreme Court

would apply a benefit of the bargain analysis here, because Tennessee courts sometimes calculate

damages for negligent misrepresentation claims under 552B the Court will also do so here.  Section

552B explains:

> (1) The damages recoverable for a negligent misrepresentation are those necessary to
> compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal
> cause, including
> > (a) the difference between the value of what he has received in the transaction and its
> > purchase price or other value given for it; and
> > (b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon
> > the misrepresentation.
> (2) the damages recoverable for a negligent misrepresentation do not include the benefit of
> the plaintiff's contract with the defendant.

Restatement (Second) of Torts § 552 (Am. Law Inst. 1977).

Here, Flatiron has not proved they suffered any pecuniary loss as a result of relying on the

alleged misrepresentation in its purchase of Paradiso.  Flatiron purchased Paradiso for

$3,107,308.59, calculated by the parties as the aggregate outstanding principal of performing loans as of June 30, 2013, multiplied by 0.32475. But the undiscounted value of Paradiso's performing loans was $9,568,309.75. Flatiron purchased Paradiso for those performing loans, including the 24 lots in Tellico Village that Paradiso was keeping. This is exactly what Flatiron negotiated to purchase. So Plaintiffs suffered no economic loss as a result of Mr. Steinberg's email. Any damages to Flatiron have arisen not from issues with the incorrect exhibits attached to the Settlement Agreement but rather from Paradiso's failure to perform under the terms of the Settlement Agreement.

### 3.   Flatiron's Negligence Bars Damages

And even if Flatiron had proven damages under one theory or another, they would be barred from recovering any damages because of their comparative fault. "The doctrine of comparative fault in Tennessee is applied to negligence cases, and negligent misrepresentation is an action 'in tort determined by the general principles of the law of negligence.'" *Staggs v. Sells*, 86 S.W.3d 219, 224 (Tenn. Ct. App. 2001) (quoting *Tartera v. Palumbo*, 453 S.W.2d 780, 784 (Tenn. 1970)). "[S]o long as a plaintiff's negligence remains less than the defendant's negligence the plaintiff may recover; in such a case, plaintiff's damages are to be reduced in proportion to the percentage of the total negligence attributable to the plaintiff." *Id.* (quoting *McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992) (adopting modified comparative fault)); *see also Bass v. Janney Montgomery Scott, Inc.*, 210 F.3d 577, 583 (6th Cir. 2000) (affirming reduction of plaintiff's award on negligent misrepresentation claim by 45% due to plaintiff's contributory negligence).

Under the Settlement Agreement, Paradiso was required to execute the quitclaim deeds and the assignments and record the release documents by August 19, 2013. Paradiso failed to do these tasks by August 19, 2013, and these failures constituted "material breaches." Paradiso also failed to keep assessments current on the 24 Performing CFDs that Paradiso retained and of which Mr. McGrath was expressly advised. The TVPOA testified that it would not have commenced the 2014

and 2015 lawsuits had Paradiso timely conveyed the 260 REOs and 16 Non-Performing CFDs via the quitclaim deeds.

Even if Flatiron had proven economic loss caused by the JS Email, the question is whether Flatiron is less at fault than Defendants. CSE owned Paradiso for two days within this timeframe (from July 23, 2013 to July 25, 2013); Flatiron owned Paradiso thereafter. CF and CI failed to execute and deliver the Release Documents jointly with Paradiso by August 19, 2013. Flatiron knew that it was only keeping 24 lots, yet failed to identify the properties to convey. And Paradiso, as owned by Flatiron, failed to pay assessments on those lots, even though Flatiron knew it was obligated to do this.

Flatiron is a sophisticated entity, represented by counsel—Mr. Diaz, his team at Jacoby Donner, and Mr. Adams. Mr. Diaz and Mr. McGrath knew that as Paradiso's new owner, Flatiron was obligated to perform under the terms of the Settlement Agreement to which Mr. McGrath had agreed. The JS Email contributed to confusion regarding what Flatiron needed to do to convey the 276 lots Paradiso had agreed to convey. But the real cause of Paradiso's failure to perform were Paradiso's and Flatiron's lawyers, who, as described colorfully by Mr. Brabham, failed to perform their obligations, giving the TVPOA no choice but to sue. The Court has already detailed the slack chain of inactivity at Paradiso in the months and years following the closing of the transaction: The Court attributes the fault for the damages to that behavior by Paradiso and its representatives. Accordingly, even assuming that Flatiron had proven each of the elements of their negligent misrepresentation claim and had shown pecuniary loss, Flatiron is more at fault here than Defendants. So under *Staggs* and *McIntyre*, Flatiron is precluded from recovering any damages.

## C. Damages for Defendants' Counterclaims

On February 20, 2020, the Court granted CF and CI's counterclaim against Paradiso for breach of the Settlement Agreement, holding that Paradiso committed the first uncured breach.

Mem & Order, Dkt No. 116 at 32.  The only issue remaining for trial on CF and CI's counterclaim is economic loss.  Plaintiffs have not challenged the legal fees Defendants have requested for this counterclaim.

"Tennessee law allows the courts to 'award all damages which are the normal and foreseeable result of a breach of contract.'" *Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*, No. 1:17-cv-8987-GHW, 2019 WL 1244294, at *9 (S.D.N.Y. Mar. 18, 2019) (quoting *Morrow v. Jones*, 165 S.W.3d 254, 259 (Tenn. Ct. App. 2004)); *accord Dan Stern Homes, Inc. v. Designer Floors & Homes, Inc.*, No. M2008-00065-COA-R3-CV, 2009 WL 1910955, at *5 (Tenn. Ct. App. June 30, 2009) ("The purpose of assessing damages in a breach of contract action is to place the plaintiff in the position the plaintiff would have been in had the contract been properly performed"); *Wills Elec. Co. v. Mirsaidi*, No. M2000-02477-COA-R3-CV, 2001 WL 1589119, at *4 (Tenn. Ct. App. Dec. 13, 2001) ("[C]ourts may allow recovery of all damages which are the normal and foreseeable results of a breach of contract.").

Attorneys' fees are a form of consequential damages recoverable for breach of contract. *Morrow*, 165 S.W.3d at 259, 260 (finding trial court "properly awarded . . . attorney's fees as consequential damages); *Haney v. Copeland*, No. E2002-00845-COA-R3-CV, 2003 WL 553548, at *2, *4 (Tenn. Ct. App. Feb. 27, 2003) (affirming trial court's decision to award attorneys' fees for breach of contract and fraud); *Bruce v. Olive*, No. 03A01-9509-CV-00310, 1996 WL 93580, at *7 (Tenn. Ct. App. Mar. 4, 1996) (allowing attorneys' fees in an action for breach of contract and legal malpractice).

Here, as a result of Paradiso's breach of the Settlement Agreement, the TVPOA filed the 2014 Loudon County Lawsuit and 2015 Monroe County Lawsuit.  CF and CI retained Todd Presnell as counsel and incurred $334,041.49 in fees to defend the 2015 Monroe County lawsuit.  CF and CI then entered in a settlement agreement with the TVPOA on March 20, 2017, whereby CF and CI

agreed to pay the TVPOA $75,000 in exchange for settling the 2014 Loudon County Lawsuit, the

2015 Monroe County Lawsuit, and any breaches of the Settlement Agreement.  Although CF and CI

also failed to perform under the Settlement Agreement by not releasing the liens by August 19, 2013,

according to the testimony at trial the TVPOA would not have filed either the 2014 Loudon County

or 2015 Monroe County lawsuits if Paradiso had supplied fully executed quitclaim deeds for the 276

properties by December 31, 2013.  So Defendants' own failures did not contribute to their economic

loss, and they can recover attorneys' fees as a form of consequential damages for Plaintiffs' breach.

"A reasonable attorney fee is calculated by the lodestar method."  *Northeast Ohio Coalition for*

*the Homeless v. Husted*, 831 F.3d 686, 702 (6th Cir. 2016) (citations omitted).  The lodestar is "the

number of hours reasonably expended on the litigation multiplied by a reasonably hourly rate."  *Id.*

(quoting *Hensley*, 461 U.S. at 433 (1933)).  Here, the hourly rates range from $320–$495 for partner

time, $265–$340 for associate time, and $245 for paralegal time.  Ms. Choi has testified that

"[h]aving retained counsel in various jurisdictions around the country, including Tennessee, the

Bradley firm's fees were commensurate with market rates and reasonable for the work performed in

defending the 2015 Monroe County lawsuit."  The Court finds Ms. Choi's testimony credible.

Accordingly, the Court finds the hourly rates and number of hours expended to be reasonable and

awards $334,041.49 in attorneys' fees to Defendants.

## III.    CONCLUSION

Flatiron struck what appears to have been a good deal to buy Paradiso, knowing that an

equity deal came with all of the liabilities associated with the company.  But Paradiso's management

seems to have forgotten that an equity deal also came with the obligation to run the company once it

was purchased.  This lawsuit should be an object lesson for corporate lawyers about many risky

practices:  signing documents without exhibits attached, late night assembly of documents on the

eve of a closing; delegation of even commonplace tasks to associates known to have trouble with

"follow-through;" and the consequences of "fast and loose" closings.  But the ultimate cause of the injury here was the failure by Paradiso's new owner and its representatives to manage the company that they had just acquired.  For these reasons, the Court finds for Defendants with respect to Plaintiffs' negligent misrepresentation claim, and for Defendants with respect to their claim for attorneys' fees.

       SO ORDERED.

Dated:  November 22, 2020

                                                _____
                                                GREGORY H. WOODS
                                   United States District Judge