```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/9/2022
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

\----------------------------------------------------------- X

FLATIRON ACQUISITION VEHICLE, LLC :
and CS PARADISO HOLDINGS, LLC, :
                            :
                    Plaintiffs, :
                            :               1:17-cv-8987-GHW
            -v-             :
                            :       MEMORANDUM OPINION
CSE MORTGAGE LLC, CAPITALSOURCE :            AND ORDER
COMMERCIAL LOAN, 2006-2, :
CAPITALSOURCE FINANCE LLC, and :
CAPITALSOURCE INC., :
                            :
                Defendants. :

\----------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

## I.     INTRODUCTION

        This litigation has a long history. Plaintiffs pursued a variety of claims against Defendants, including a claim that Defendant CSE Mortgage LLC ("CSE") breached the terms of a contract it entered into with Plaintiff Flatiron Acquisition Vehicle, LLC ("Flatiron"). That agreement contained a fee-shifting provision that covered fees and expenses incurred in litigation between its parties "for breach of such party's obligations under" the agreement. The Court resolved the breach of contract claim in a motion to dismiss, but the parties continued to litigate the remaining claims through trial, at which the Court ruled in favor of Defendants on all remaining claims. CSE has now moved for the reimbursement of all of the attorneys' fees incurred by it and its affiliated companies during the course of the lengthy litigation—totaling $2,426,762.30 in attorneys' fees and $48,440.87 in costs. But contractual fee-shifting provisions are to be construed strictly under New York law. And because the fee-shifting provision in the relevant agreement only covered claims for breach of the obligations of a party *under* that agreement—rather than all claims related to the agreement—CSE is entitled only to a fraction of the fees that it claims.

II.     BACKGROUND

A. Facts

The Court assumes the reader's familiarity with its prior decisions, which lay out the history

of this litigation in detail.  In broad brush, Flatiron was created to acquire CS Paradiso Holdings,

LLC ("Paradiso"), which owned an extensive portfolio of real property, including property located

in Tennessee.  CSE, together with CapitalSource Commercial Loan LLC ("CS Commercial"), owned

Paradiso.  Flatiron entered into an agreement with CSE and CS Commercial to purchase the equity

of Paradiso.  Dkt. No. 77-2 (the "Purchase Agreement").

At the time of the acquisition, Paradiso was enmeshed in litigation with the Tellico Village

Property Owners Association (the "TVPOA") with respect to properties in Tennessee owned by

Paradiso.  Paradiso had failed to make payments owed to the TVPOA.  The lawsuit was known to

be an issue, so before finalizing the Purchase Agreement, Flatiron requested a fully executed version

of the agreement embodying the settlement of the litigation between Paradiso and the TVPOA (the

"Settlement Agreement").  The parties to the Settlement Agreement were the TVPOA, Paradiso,

and two entities affiliated with CSE and CS Commercial—CapitalSource, Inc. ("CI") and

CapitalSource Finance ("CF").  This litigation stems from the failure by Paradiso, CI, and CF to

comply timely with their obligations under the Settlement Agreement.

The Purchase Agreement required that a copy of the Settlement Agreement be provided to

Flatiron as a condition to closing the sale of Paradiso (but consummation of the terms of the

agreement was not, allowing it to slip through the cracks after closing).  The Settlement Agreement

was listed on a schedule to the Purchase Agreement, along with all of the other contracts to which

Paradiso was a party.  Section 6.1(c) of the Purchase Agreement provides the following:

> The obligations of the Buyer to consummate the transactions contemplated hereby are
> subject to the satisfaction of each of the following conditions: . . . .  (c)  The Seller shall have
> delivered to the Buyer an assignment of limited liability company interests, in the form
> attached as Exhibit B, to effect the transfer of the Equity Interests from the Seller to the

2

Buyer, and all other related documents as counsel for the Buyer shall have reasonably requested prior to the Closing Date, including, without limitation, all contracts to which the Company is a party, *which contracts are set forth on Schedule C attached hereto and incorporated herein.*

Purchase Agreement § 6.1(c) (emphasis added).

The Purchase Agreement also contained a fee-shifting provision.  Section 6.3(c) of the Purchase Agreement provides the following:

Notwithstanding anything to the contrary in this Agreement, in the event that either Seller or Buyer, as the case may be, shall bring a lawsuit against the other party for breach of such party's obligations under this Agreement, the losing party shall pay the prevailing party's costs and expenses incurred in connection with such litigation, including without limitation reasonable attorneys' fees.  The "prevailing party" shall be determined by the court hearing such matter.

*Id.* § 6.3(c).  The "Agreement" referred to in this provision of the Purchase Agreement is defined in the introductory paragraph of the Purchase Agreement as "This Limited Liability Company Interest Purchase Agreement (this 'Agreement')."  *Id.* at 1.

Defendants, having prevailed with respect to all of their claims in this case, have presented this motion for the reimbursement of their fees pursuant to this provision of the contract.  The Court has already determined that CSE is a prevailing party, entitled to the reimbursement of fees— no party disputes that here.  The question is what the amount of the fees should be.  The language of Section 6.3(c) does not cover all litigation arising out of or involving the Purchase Agreement by any party.  As described further below, it only captures litigation brought by Flatiron against CSE and CS Commercial, and vice versa, not litigation brought by or against any person.  And it only captures fees incurred in connection with litigation for the breach of a party's obligations *under* the Purchase Agreement, not any litigation arising out of or in connection with it.  As a result, to resolve the issue of Defendants' entitlement to the reimbursement of fees, it is important to lay out a scaffolding of the case's procedural history to show which parties were pursuing what claims at various stages of the litigation.

### B.  Procedural History

Over this litigation's long lifespan, Plaintiffs have presented four iterations of the complaint to the Court.  The Court has resolved a motion to dismiss, a motion for summary judgment, and presided over a bench trial.  The Court need not detail all of the twists and turns of this litigation here.  But a summary description of the parties to the case, and the claims being pursued at various times, is needed.

Flatiron and Paradiso filed their first complaint in this matter in New York State court on October 13, 2017.  Dkt. No. 1-1.[1]  The only defendants named in that complaint were CSE and CS Commercial—the parties to the Purchase Agreement.  The original complaint asserted eight causes of action against CSE and CS Commercial, describing the case as "aris[ing] out of Defendants', former controlling members and/or managing members of Plaintiff Paradiso, failure to meet their fiduciary duties and obligations."  *Id.* at 1.  Paradiso included a potpourri of claims in the complaint.  Paradiso alleged in two of the complaint's eight counts that CSE and CS Commercial had breached the Purchase Agreement and the Settlement Agreement.  *Id.* at 21–24.  The remainder of the claims derived from the same alleged conduct, and included alleged violations of the breach of duty of care and loyalty, together with claims for corporate waste and negligence.  *Id.* at 17–26.

CSE and CS Commercial asked for leave to file a motion to dismiss the first complaint.  *See* Dkt. No. 10.  Their arguments led the Court to grant Flatiron leave to amend the complaint.  Dkt. No. 20.  The first amended complaint (the "FAC") was filed on December 22, 2017.  Dkt. No. 21. The FAC added two new defendants—CI and CF, the parties to the Settlement Agreement.  The FAC described that its claims arose "out of Defendants' bad acts, failure to meet their duties and contractual obligations to Plaintiff Flatiron and/or Plaintiff Paradiso."  *Id.* ¶ 2.  Like the original complaint, the FAC asserted a variety of causes of action against Defendants.  Its first cause of

---

[1] The action was removed to federal court on November 16, 2017.  Dkt. No. 1.

action was brought specifically by Paradiso for breach of the Settlement Agreement against CI and CF, the two counterparties to that agreement. *Id.* ¶¶ 115–27. The second cause of action was brought by Flatiron against all of the defendants for breach of the Purchase Agreement. *Id.* ¶¶ 128–37. Plaintiffs asserted a claim for violation of the Tennessee lien law against all of the defendants because of their alleged failure to record certain releases. *Id.* ¶¶ 138–45. Plaintiffs also asserted a claim for negligent misrepresentation against all of the defendants as a result of their alleged failure to file documents required to be filed pursuant to the Settlement Agreement. *Id.* ¶¶ 146–56.

On January 22, 2018, Defendants moved to dismiss the FAC. Dkt. No. 36. In response, Flatiron and Paradiso again amended their complaint. The second amended complaint (the "SAC") was filed on February 12, 2018. Dkt. No. 41. The facts pleaded in the SAC were more robust, but the parties and claims did not change—Paradiso continued its pursuit of a claim for breach of the Settlement Agreement and Flatiron pursued its claim for a breach of the Purchase Agreement. Defendants moved to dismiss the SAC.

On March 17, 2019, the Court denied Defendants' motion to dismiss Paradiso's claim for breach of the Settlement Agreement. Memorandum Opinion and Order dated March 17, 2019 ("Mar. 2019 Opinion"), Dkt. No. 80. However, the Court granted Defendants' motion to dismiss Plaintiffs' claims for breach of the Purchase Agreement, violation of the Tennessee lien law, and negligent misrepresentation. *Id.* at 24–35. So at this point in time, Flatiron's claim for breach of the Purchase Agreement fell out of the case. But Paradiso's claim for breach of the Settlement Agreement continued on.

Plaintiffs filed their third amended complaint on April 16, 2019 (the "TAC"). Dkt. No. 83. The TAC did not include a claim for breach of the Purchase Agreement by Flatiron. It advanced only three claims. In count one of the TAC, Paradiso (not Flatiron) claimed that CI and CF had breached their obligations under the Settlement Agreement. TAC § VII ("FIRST CLAIM FOR

RELIEF BREACH OF SETTLEMENT AGREEMENT (By Plaintiff Paradiso against Defendants CapitalSource and CapitalSource Finance)").  The second cause of action was asserted by Paradiso against all of the defendants for violation of the Tennessee lien law.  *Id.* ¶¶ 226–65.  The third cause of action was asserted by both Flatiron and Paradiso against all of the defendants for negligent misrepresentation.  The claim focused on an alleged misrepresentation by CSE's counsel regarding the accuracy of the version of the settlement agreement provided by it to Flatiron in advance of the closing of the shares of Paradiso.  *Id.* ¶¶ 266–91.

Defendants answered the TAC on May 8, 2019.  Dkt. No. 87.  Together with their answer, CI, CF, and CSE asserted counterclaims against Paradiso and Flatiron for breach of contract (the "Counterclaims").  The first claim was brought against Paradiso and Flatiron as a result of Paradiso's alleged failure to comply with the terms of the Settlement Agreement, which required that certain documents be filed timely.  Counterclaims ¶¶ 75–87.  The counterclaim did not specify on behalf of which counterclaim plaintiff it was brought:  one of the counterclaim plaintiffs, CSE, was not a party to the Settlement Agreement.  The breaches alleged and damages sought with respect to the counterclaim for breach of the settlement agreement relate only to CI and CF.  *Id.* ¶¶ 84–87.  The counterclaim does not describe the basis upon which the breach of contract claim might be brought against Flatiron, which was not a party to the Settlement Agreement.

The second counterclaim requested that the Court grant declaratory judgment against Flatiron to award it fees as a result of CSE's successful defense against Flatiron's claim for breach of the Purchase Agreement.  The request for entry of declaratory relief was expressly founded solely on the Court's decision to grant Defendants' motion to dismiss Flatiron's claim for breach of the Purchase Agreement.  *Id.* ¶¶ 91–96.[2]

---

[2] Counterclaims ¶¶ 91–96 ("Flatiron asserted a claim for breach of contract under the Purchase Agreement against CSE and Defendants on October 13, 2017; December 22, 2017; February 12, 2018; and proposed claims on September 18, 2018 . . . .  As a direct result of Defendants' motions to dismiss, Flatiron withdrew the original complaint and filed a

On June 28, 2019, Defendants filed a motion for summary judgment on all claims asserted in the TAC and with respect to their counterclaims. Dkt. Nos. 96–99, 103–05. On February 20, 2020, the Court granted in part and denied in part Defendants' motion for summary judgment. Memorandum Opinion and Order dated February 20, 2020. Dkt. No. 116. The Court granted Defendants' motion for summary judgment regarding Paradiso's claim for breach of the Settlement Agreement. *Id.* at 29. The Court also held that Defendants were entitled to judgment with respect to their claim for breach of the Settlement Agreement because, although both parties had breached the agreement, "Defendants were the first to cure their material breach of the Settlement Agreement." *Id.*

The Court also granted Defendants' motion for summary judgment with respect to their claim for declaratory judgment. The Court found that CSE and CS Commercial were "prevailing parties" entitled to the reimbursement of their legal fees pursuant to Section 6.3(c) of the Purchase Agreement. *Id.* at 33. In doing so, the Court embraced the sole rationale presented by Defendants for their motion—namely the Court's decision to dismiss Flatiron's claim for breach of the Purchase Agreement. *Id.*; *see also* Dkt. No. 97 at 24–25. The Court did not grant declaratory judgment that CSE or CS Commercial were prevailing parties with respect to any other claim or on any other ground.

The Court also granted summary judgment to Defendants with respect to Plaintiffs' claims under the Tennessee lien law. The Court denied summary judgment with respect to Plaintiffs' claim for negligent misrepresentation.

---

First Amended Complaint, a Second Amended Complaint, and a Proposed Third Amended Complaint. On March 2017 [sic], the Court dismissed Flatiron's claim for breach of the Purchase Agreement with prejudice. Flatiron filed a Third Amended Complaint on April 16, 2019 which did not assert any claim for breach of the Purchase Agreement. CSE is the prevailing party under the Purchase Agreement and is thus entitled to costs, expenses, and attorneys' fees." (internal references and citations omitted)).

Because a substantial number of claims had been pruned through summary judgment motion practice, limited issues remained for resolution at trial.  The only surviving claim by Plaintiffs was their claim for negligent misrepresentation, arising from the email sent by CSE's counsel prior to the acquisition of Paradiso by Flatiron.  Joint Pretrial Order, Dkt. No. 136 ¶ 4.A.  The only issue to be tried by Defendants was the amount of damages due as a result of Paradiso's breach of the Settlement Agreement because the Court had already found in their favor with respect to liability.  *Id.* ¶ 4.C.  The Court deferred resolution of the amount of fees due to Defendants CSE and CS Commercial as a result of its declaratory judgment for after trial.  *Id.*

Trial in this case took place in October 2020.  Nearly all of the time at trial was dedicated to testimony regarding the negligent misrepresentation claim.  Defendants' evidence regarding the amount of damages due as a result of their counterclaims was not disputed.  The Court issued its findings of facts and conclusions of law on November 22, 2020.  Dkt. No. 181.  The Court found that Plaintiffs had failed to prove their claim of negligent misrepresentation.  And the Court awarded the proven damages that resulted from Paradiso's failure to comply with the Settlement Agreement.

After trial, CSE moved for an award of attorneys' fees, expenses, and costs under Section 6.3(c) of the Purchase Agreement.  Dkt. Nos. 183–86.  In its motion, CSE sought fees for much more than the work that resulted in the dismissal of Plaintiffs' claims for breach of the Purchase Agreement—which was the subject of the declaratory judgment decision by the Court.  Instead, CSE is seeking reimbursement of all fees incurred by all of the CapitalSource-affiliated defendants in connection with the litigation as a whole.  Plaintiffs opposed the motion, Dkt. No. 190, and CSE replied, Dkt. No. 192 (the "Reply").

## III.  DISCUSSION

### A.  Legal Standard

#### 1.  New York Contract Law Generally

The Purchase Agreement is governed by New York law.  Under New York law, "[w]hen interpreting a contract, our 'primary objective . . . is to give effect to the intent of the parties as revealed by the language of their agreement.'" *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 113–14 (2d Cir. 2014) (alteration in original) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000)). "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Id.* at 114 (brackets omitted) (quoting *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012)).

As a "threshold question," courts must consider if "the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998).  "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)).  "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 374 (S.D.N.Y. 2019) (quoting *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009)); *see also Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (2011) ("Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the parties intended a meaning different than that expressed in the agreement . . . .").

Courts consider a contract unambiguous when it has "a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion." *Olin Corp.*, 704 F.3d at 99 (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889

F.2d 1274, 1277 (2d Cir. 1989)).  Conversely, "[a] contract is ambiguous under New York law 'if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Orchard Hill Master Fund Ltd. v. SBA Comm'ns Corp.*, 830 F.3d 152, 156–57 (2d Cir. 2016) (quoting *Chesapeake Energy Corp.*, 773 F.3d at 114).  "The language of a contract . . . is not made ambiguous simply because the parties urge different interpretations." *Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 348 (S.D.N.Y. 2013) (internal quotation marks omitted) (quotation omitted).

Courts analyze ambiguity using the "normal rules of contract interpretation:  words and phrases should be given their plain meaning and a contract should be construed as to give full meaning and effect to all of its provisions." *Orchard Hill*, 830 F.3d at 157 (internal quotation marks omitted) (quoting *Orlander*, 802 F.3d at 295); *see also Brad H.*, 17 N.Y.3d at 185 ("To determine whether a writing is unambiguous, language should not be read in isolation because the contract must be considered as a whole.").  But a court applying New York law "may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." *Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 12-cv-7096, 2015 WL 2449313, at *2 (S.D.N.Y. May 22, 2015) (quoting *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992)).  Rather, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *MHR Cap. Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (quotation omitted).

2.  **Contracts for Reimbursement of Attorneys' Fees Are to Be Construed Strictly**

Contracts for the reimbursement of attorneys' fees are to be strictly construed.  "Under the general rule in New York, attorneys' fees are the ordinary incidents of litigation and may not be awarded to the prevailing party unless authorized by agreement between the parties, statute, or court rule." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003).  "This policy 'provides freer and more equal access to the courts . . . [and] promotes democratic and libertarian principles.'" *Id.* (alterations in original) (quoting *Mighty Midgets, Inc. v. Centennial Ins.*, 47 N.Y.2d 12, 22 (1979)). "Accordingly, while parties may agree that attorneys' fees should be included as another form of damages, such contracts must be strictly construed to avoid inferring duties that the parties did not intend to create."  *Id.*; *see also Hooper Assocs., Ltd. v. AGS Computs., Inc.*, 74 N.Y.2d 487, 492 (1989) ("Inasmuch as a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorney's fees, the court should not infer a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear from the language of the promise.").

Moreover, under New York law, "a general contract provision for the shifting of attorneys' fees does not authorize an award of fees for time spent in seeking the fees themselves." *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1266 (2d Cir. 1987).  "Of course, it is possible to contract for such an allowance but, as it is an agreement contrary to what is usual, specific language would be needed to show such an agreement." *Id.* (quoting *Swiss Credit Bank v. Int'l Bank Ltd.*, 200 N.Y.S.2d 828, 831 (Sup. Ct. 1960)).  Absent specific language "to indicate that time spent in justifying a fee application was to be included," a fee-shifting provision will not encompass a claim for fees incurred in pursuing the fee application.  *Id.*

### 3.   Evaluation of the Reasonableness of Attorneys' Fees Requests

"[T]he touchstone for an award of attorneys' fees pursuant to a contract is reasonableness." *Carco Grp., Inc. v. Maconachy*, 718 F.3d 72, 86 (2d Cir. 2013).  "Because a fee-shifting clause can produce perverse incentives for a litigant (and his attorneys), courts must scrutinize fee requests to ascertain whether they are reasonable." *Diamond D Enters. USA, Inc. v. Steinsvaag*, 979 F.2d 14, 19 (2d Cir. 1992) (citation omitted).  "The rule in New York is that an award of fees in excess of the amount *involved* in a litigation would normally appear to be unreasonable." *Id.* (quotation omitted). "[T]he amount reasonably in controversy in a litigation, not the amount actually recovered, is generally the ceiling on the fees that may be awarded pursuant to a fee-shifting clause.  This is only a rule of thumb, however.  It is a starting point in the process of ultimately determining whether a fee award is reasonable." *Id.* at 19–20; *see also Carco Grp.*, 718 F.3d at 88.

With this rule of thumb in mind, the Court also looks to the lodestar analysis to evaluate the reasonableness of a requested award of fees.  The lodestar—"the product of a reasonable hourly rate and the reasonable number of hours required by the case—creates a 'presumptively reasonable fee.'" *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany Cnty. Bd. of Elections*, 522 F.3d 182, 183 (2d Cir. 2008)). While presumptively reasonable, the lodestar is not "conclusive in all circumstances." *Id.* at 167 (quoting *Perdue v. Kenny A. ex rel Winn*, 559 U.S. 542, 553 (2010)).  A district court "may adjust the lodestar when it does not adequately take into account a factor that may properly be considered in determining a reasonable fee.  However, such adjustments are appropriate only in rare circumstances, because the lodestar figure [already] includes most, if not all, of the relevant factors constituting a reasonable attorney's fee." *Id.* (internal quotations and citations omitted) (alteration in original).

Second Circuit precedent requires a party seeking an award of attorneys' fees to support its request with contemporaneous time records that show "for each attorney, the date, the hours expended, and the nature of the work done." *N.Y. State Ass'n for Retarded Child., Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983). District courts have "considerable discretion" in determining what constitutes a reasonable award of attorneys' fees. *Arbor Hill*, 522 F.3d at 190. The Second Circuit has directed that district "courts should generally use the hourly rates employed in the district in which the reviewing court sits in calculating the presumptively reasonable fee." *Restivo v. Hessemann*, 846 F.3d 547, 590 (2d Cir. 2017) (quoting *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009)). Those hourly rates "are the market rates 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Gierlinger v. Gleason*, 160 F.3d 858, 882 (2d Cir. 1998) (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)).

In determining a reasonable hourly fee, the Second Circuit has also instructed district courts to consider "*all* of the case-specific variables." *Arbor Hill*, 522 F.3d at 190. The touchstone inquiry is "what a reasonable, paying client would be willing to pay." *Id.* at 184; *see id.* at 191 ("By asking what a reasonable, paying client would do, a district court best approximates the workings of today's market for legal services."). The court should "bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively" and "should also consider that [a client] might be able to negotiate with his or her attorneys." *Id.* at 190. A district court may additionally factor into its determination "the difficulty of the questions involved[,] the skill required to handle the problem[,] the time and labor required[,] the lawyer's experience, ability and reputation[,] the customary fee charged by the Bar for similar services[,] and the amount involved." *OZ Mgmt. LP v. Ozdeal Inv. Consultants, Inc.*, No. 09-cv-8665, 2010 WL 5538552, at *2 (S.D.N.Y. Dec. 6, 2010) (alterations in original) (quoting *F.H. Krear*, 810 F.2d at 1263), *report and recommendation adopted*, No. 09-cv-8665, 2011 WL 43459 (S.D.N.Y. Jan. 5, 2011).

"The district court retains discretion to determine what constitutes a reasonable fee." *Millea*, 658 F.3d at 166 (alteration omitted) (quoting *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 758 (2d Cir. 1998)).  "However, this discretion is not unfettered," and "the district court must abide by the procedural requirements for calculating those fees articulated by [the Second Circuit] and the Supreme Court."  *Id.*  "Attorney's fees must be reasonable in terms of the circumstances of the particular case[.]"  *Alderman v. Pan Am World Airways*, 169 F.3d 99, 102 (2d Cir. 1999).

## B. Application

### 1. The Purchase Agreement's Fee-Shifting Provision Is Limited In Scope

CSE's motion requests the reimbursement of legal fees that do not fall within the ambit of Section 6.3(c) of the Purchase Agreement.  As described above, the Purchase Agreement provides for fee-shifting in prescribed circumstances:

> Notwithstanding anything to the contrary in this Agreement, in the event that either Seller or Buyer, as the case may be, shall bring a lawsuit against the other party for breach of such party's obligations under this Agreement, the losing party shall pay the prevailing party's costs and expenses incurred in connection with such litigation, including without limitation reasonable attorneys' fees.  The "prevailing party" shall be determined by the court hearing such matter.

Purchase Agreement § 6.3(c).  The unambiguous language of the Purchase Agreement limits both who may seek reimbursement of their fees and the categories of claims covered by the clause.[3]  CSE is seeking reimbursement for fees incurred that fall outside of the scope of the parties' agreement.

First, the Purchase Agreement only covers actions brought by "Seller"—defined as CSE and CS Commercial—against "Buyer"—defined as Flatiron, and vice versa.  The Purchase Agreement might have used more expansive language to capture all litigation by or against any affiliate of Buyer

---

[3] The clause refers to a party bringing a "lawsuit" for breach of the other parties' obligations under the Agreement.  The Court construes this to be a reference to a claim, rather than the lawsuit as a whole.  Neither party has argued that the provision should be read more broadly to encompass all claims brought in a lawsuit so long as one of the claims is a covered claim for breach of the Agreement.  The Court agrees that such a construction would be unsound.  As described above, under New York law contractual fee-shifting provisions are to be construed strictly.  It is not unmistakably clear that such a broad construction of the word "lawsuit" was intended here, given the limiting language contained in the remainder of the provision.

or Seller, or by or against any person, but it did not.  Instead, the language is specifically limited to actions by the identified entities.  Moreover, the Purchase Agreement's fee-shifting provision is limited to actions by those entities against each other.  It does not capture all litigation against any affiliate of Buyer or Seller, or any other person; it captures a lawsuit brought by Seller or Buyer "against the other party."  *Id.* ("[E]ither Seller or Buyer, as the case may be, shall bring a lawsuit *against the other party*." (emphasis added)).

Thus, the Purchase Agreement does not cover fees defending against claims asserted by Paradiso or for any claims brought by any person against Paradiso—Paradiso is neither "Buyer" nor "Seller."  Similarly, the Purchase Agreement does not provide for the payment of fees for claims brought by or against CI or CS.  Because, likewise, neither of those entities is "Buyer" or "Seller." The language of the Purchase Agreement clearly limits the entities that fall within its scope.

Second, the Purchase Agreement only covers actions for breach of Buyer's or Sellers' obligations *under* the Purchase Agreement.  *Id.* ("[A]gainst the other party for breach of such party's obligations *under* this Agreement." (emphasis added)).  This limitation is significant.  The word "under" in this context has plain meaning.[4]  The text of the Purchase Agreement limits the nature of the claims for which fees may be sought to claims for breach of contractual obligations under the agreement—that is, obligations created by the agreement.

Defendants do not present meaningful arguments regarding these evident textual limitations on the scope of the fee-shifting provision in the Purchase Agreement.  Instead, in their arguments, they add words to the contractual language that do not appear in it—such as "involve" and "arose." CSE argues that the provision entitles it to recover all of its attorneys' fees from the start of this litigation through the conclusion of trial because the provision "extends to claims that *involve* the

---

[4] "Under" means "subject to the authority, control, guidance, or instruction of," i.e., "under the terms of the contract." *Under*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/under (last visited February 7, 2022).

parties' respective obligations under the Purchase Agreement, as opposed to being limited to claims directly asserting breach of the Purchase Agreement." Dkt. No. 184 at 14–15 (emphasis added). But the parties did not include the word "involve" in Section 6.3(c) of the Purchase Agreement. Thus, the language of the Purchase Agreement does not extend to claims that "involve" the parties' obligations under the agreement, but, rather to, as the agreement states, claims for the breach of obligations under the agreement.

Similarly, CSE argues that "all claims arose in one way or another under the Purchase Agreement." *Id.* at 18. Again, CSE's argument relies on the introduction of words that do not appear in the contract—here "arose." Defendants point the Court to cases analyzing fee award requests pursuant to contracts that use broader language, capturing all claims "arising out of" an agreement. *See, e.g., Price v. Cushman & Wakefield, Inc.,* No. 08-cv-8900, 2012 WL 13070114, at *2 (S.D.N.Y. Jan. 4, 2012) (analyzing language providing that "In the event any legal action is commenced to interpret or enforce the terms of or obligations arising out of this Agreement"); *Vista Outdoor Inc. v. Reeves Fam. Tr.,* No. 16-cv-5766, 2018 WL 3104631, at *2 (S.D.N.Y. May 24, 2018) (analyzing language providing that "In the event that any Action is instituted concerning or arising out of this Agreement, the prevailing party shall recover all of such party's costs and reasonable attorneys' fees.").[5]

Contractual interpretation starts and ends with the language of the contract when a contract is unambiguous. That other agreements have used more expansive language—which courts have then construed in light of that expansive language—does not change the meaning of the text of the Purchase Agreement. If anything, the existence of more comprehensive language in the marketplace underscores the significance of the parties' decision to use more constrained language in the

---

[5] There is some dispute about the meaning of the phrase "arising out of" as used in various contexts, but, at the least, the phrase implies a causal connection. "To 'arise out of' means 'to originate from a specified source,' and generally indicates a causal connection." *Phillips v. Audio Active Ltd.,* 494 F.3d 378, 389 (2d Cir. 2007).

Purchase Agreement.  CSE's advocacy for a broader reading requires that the Court import language

that is not found in the text.  Under New York law, however, the Court is limited by the language

actually contained in an agreement, especially when interpreting a fee-shifting provision.

Third, claims for breach of contractual obligations under the Settlement Agreement are not

covered by Section 6.3(c) of the Purchase Agreement.  Defendants argue that the Settlement

Agreement is incorporated by reference into the Purchase Agreement, but the text of the Purchase

Agreement is not sufficiently clear to support that conclusion.

> Under New York law, "a paper referred to in a written instrument and sufficiently
> described may be made a part of the instrument as if incorporated into the body of
> it."  At common law, "[i]n order to uphold the validity of terms incorporated by
> reference it must be clear that the parties to the agreement had knowledge of and
> assented to the incorporated terms."  New York follows that common law rule by
> "requir[ing] that the paper to be incorporated into a written instrument by reference
> must be so referred to and described in the instrument that the paper may be
> *identified beyond all reasonable doubt*."

*PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (citations omitted).

As described above, Section 6.1(c) of the Purchase Agreement provides the following:

> The obligations of the Buyer to consummate the transactions contemplated hereby are
> subject to the satisfaction of each of the following conditions: . . . .  (c)  The Seller shall have
> delivered to the Buyer an assignment of limited liability company interests, in the form
> attached as Exhibit B, to effect the transfer of the Equity Interests from the Seller to the
> Buyer, and all other related documents as counsel for the Buyer shall have reasonably
> requested prior to the Closing Date, including, without limitation, all contracts to which the
> Company is a party, *which contracts are set forth on Schedule C attached hereto and incorporated herein*.

Purchase Agreement § 6.1(c) (emphasis added).  There are two ways to parse the italicized language:

first, that the contracts are "incorporated herein."  Defendants take this position.  The alternative—

and much more plausible—construction, is that Schedule C, rather than the documents listed in it, is

"incorporated herein."  This construction makes more sense for a number of reasons.

First is the structure of the provision:  the text describes something that is "attached hereto

*and* incorporated herein."  *Id.* (emphasis added).  The clause makes sense as a whole if it refers to

Schedule C, which can satisfy both conditions.  Schedule C is attached to the Purchase Agreement.
The contracts listed on Schedule C are not.

Second, construing the document to incorporate the Settlement Agreement and the other
documents in the Purchase Agreement does not work in context each time that the term
"Agreement" is used throughout the Purchase Agreement's text.  The Purchase Agreement defines
the term "Agreement" as "This Limited Liability Company Interest Purchase Agreement (this
'Agreement')."  *Id.* at 1.  Defendants argue that because the Purchase Agreement incorporates all of
the contracts listed on Schedule C by reference, the defined term "Agreement" should be read to
encompass all of the scheduled agreements, including the Settlement Agreement.  Thus, in their
view, Section 6.3(c) covers litigation for breach of obligations under the Settlement Agreement as
well as the Purchase Agreement.

However, the term "Agreement" is used pervasively in the Purchase Agreement in a way that
would make no logical sense if the term encompassed all of the documents listed on Schedule C to
the agreement.  For example, the choice of law provision in the Purchase Agreement states that
"This Agreement shall be governed by . . . the laws of the State of New York . . . ."  *Id.* § 10.9.
Reviewing all uses of the term "Agreement" in the Purchase Agreement, the Court cannot conclude
that the parties intended the term "Agreement" to refer collectively to all of the agreements to which
Paradiso was a party, including the Settlement Agreement.

Moreover, it makes little sense to read the term "Agreement" to refer to the Settlement
Agreement in the context of Section 6.3(c) of the Purchase Agreement.  As described above, Section
6.3(c) only covers claims by and against "Buyer" and "Seller."  The parties with standing to pursue a
claim for a breach of the Settlement Agreement—Paradiso, CI, and CF—are neither "Buyer" nor
"Seller."  And Section 6.3(c) only covers breaches of "such party's obligations under this
Agreement."  Paradiso, CI, and CF do not have obligations under the Settlement Agreement.

Therefore, even if the Settlement Agreement were incorporated by reference into the Purchase Agreement, fees incurred by them defending and prosecuting claims related to the Settlement Agreement would not be covered by Section 6.3(c).  This is another reason to conclude that it was not the parties' intent to incorporate the Settlement Agreement into the Purchase Agreement.

The Purchase Agreement does not incorporate the Settlement Agreement by reference. New York law requires "that the paper to be incorporated into a written instrument by reference must be so referred to and described in the instrument that the paper may be *identified beyond all reasonable doubt*."  *PaineWebber*, 81 F.3d at 1201 (quotation omitted).  Given the text of the Purchase Agreement, there is substantial doubt that the Settlement Agreement and the other documents were referenced and identified in the Purchase Agreement for incorporation into it.

### 2. A Limited Subset of the Claims Pursued in this Litigation are Encompassed within the Purchase Agreement's Fee-Shifting Provision

Only a subset of the claims raised in this case were made by Flatiron, CSE, or CS Commercial for breach of the other party's obligations under the "Agreement."  The initial complaint asserted claims for breach of the Purchase Agreement by Flatiron against CSE and CS Commercial.  The First Amended Complaint contained a claim by Flatiron against Defendants, including CSE and CS Commercial, for breach of the Purchase Agreement.  Flatiron continued its pursuit of that claim in the Second Amended Complaint.  On March 19, 2019, the Court granted Defendants' motion to dismiss Flatiron's claims for breach of the Purchase Agreement.  Mar. 2019 Opinion.  So, as of March 19, 2019, none of the claims being pursued by Plaintiffs were subject to the fee-shifting provision.  The various claims Plaintiffs pursued related in some way or another to the acquisition of Paradiso.  The claims arguably related to, or involved, the Purchase Agreement. But they were not claims for the breach of CSE or CS Commercial's obligations under the Agreement.  Again, because Paradiso, CI, and CF were not "Buyer" or "Seller," and because the Settlement Agreement was not incorporated into the Purchase Agreement, Paradiso's continued

claims for breach of the Settlement Agreement against CI and CF were not covered by Section 6.3(c).

Most significantly, Flatiron's claim for negligent misrepresentation was not a claim for breach of any party's obligations under the Purchase Agreement.  The negligent misrepresentation claim arose from alleged conduct that preceded the closing of the Purchase Agreement—the obligation that Plaintiffs claimed to have been breached arose at common law, not under the agreement itself.  Similarly, the claims for violation of the Tennessee lien law involved obligations arising under Tennessee law; they were not claims for breach of any party's obligations under the Purchase Agreement.

Defendants reintroduced a cognizable claim for breach of a party's obligations under the Purchase Agreement in their May 8, 2019 counterclaim.  In it, CSE asserted a claim for declaratory judgment for reimbursement of its fees owed under the Purchase Agreement.  That claim was litigated through summary judgment, but it was a discrete, and relatively simple issue.  As described above, Defendants' summary judgment motion with respect to the declaratory judgment action did not implicate issues of fact developed during discovery—the basis for the claim was the Court's March 2019 ruling in Defendants' favor in response to their motion to dismiss.  Briefing on this issue in Defendants' memorandum of law in support of their motion for summary judgment occupied only two paragraphs out of twenty five pages.  Dkt. No. 97 at 24–25.

Section 6.3(c) of the Purchase Agreement does not include specific language to indicate that time spent in justifying a fee application was to be included.  Because it does not, CSE may not pursue a claim for the cost of litigating amount of fees to be awarded to it.  *See F.H. Krear & Co.*, 810 F.2d at 1267.

So, of the claims pursued in this litigation only a subset are covered by the fee-shifting language in Section 6.3(c) of the Purchase Agreement:  (1) Flatiron's claims against CSE for breach

of the Purchase Agreement; and (2) CSE's claims against Flatiron as a "prevailing party" with respect to the claims brought against it for breach of its obligations under the Purchase Agreement. The first category—Flatiron's claims for breach of the Purchase Agreement—were resolved on March 19, 2021.  The second category—CSE's claims under the Purchase Agreement as a "prevailing party" with respect to the breach of contract claim brought against it by Flatiron—were very limited in scope.  The litigation of those claims did not require discovery after March 19, 2021. They were the subject of limited briefing in the parties' summary judgment motion practice.  And they were not litigated at trial.  CSE's fees pursuing the fee award are not covered by the contract.

### 3. The Reasonableness of The Requested Fees

#### a. Hours Reasonably Expended on Account of CSE

Because not all of the fees claimed are covered by Section 6.3(c) of the Purchase Agreement, the Court must develop a reasonable method to determine how much of the claimed fees were reasonably incurred on account of covered claims and how much should be excluded.  "In determining the number of hours reasonably expended for purposes of calculating the lodestar, the district court should exclude excessive, redundant or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims." *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999).  Here, the Court is tasked to exclude hours dedicated to the defense of claims that are not covered by the fee-shifting provision in the Purchase Agreement.

The resolution of an application for an award of attorneys' fees "should not result in a second major litigation." *Fox v. Vice*, 563 U.S. 826, 838 (2011) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)).  When presented with a fee application after a party has prevailed through litigation or settlement, "district courts have the discretion to set attorneys' fees as they reasonably see fit." *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 606 (2d Cir. 2020).  A district court may arrive at that conclusion through a detailed examination of the fee application. *Marion S. Mishkin Law Office*, 767 F.3d 144,

150 (2d Cir. 2014).  However, a "district court is not obligated to undertake a line-by-line review of [an] extensive fee application.  It may, instead, 'exercise its discretion and use a percentage deduction as a practical means of trimming fat.'"  *Id.* (quoting *McDonald ex rel. Prendergast v. Pension Plan of the NYSA–ILA Pension Tr. Fund*, 450 F.3d 91, 96 (2d Cir. 2006)).  "Using this form of 'rough justice,' district courts in our Circuit regularly employ percentage reductions as an efficient means of reducing excessive fee applications."  *Id.* (collecting cases).

    The Court has the discretion to award fees for fees expended for the defense of claims that are "inextricably intertwined" with those covered by the Purchase Agreement's fee-shifting provision.  "Where the district court determines that the successful and unsuccessful claims are 'inextricably intertwined' and 'involve a common core of facts or [are] based on related legal theories,' it is not an abuse of discretion for the court to award the entire fee."  *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1183 (2d Cir. 1996) (alteration in original) (quoting *Dominic v. Consolidated Edison Co. of N.Y., Inc.*, 822 F.2d 1249, 1259 (2d Cir. 1987)).  This concept can be applied as method to evaluate proposed attorneys' fees in contexts such as this—where some claims are covered by a fee-shifting provision, but others are not.  *See, e.g.*, *PaySys Int'l, Inc. v. Atos Se*, No. 14-cv-10105, 2019 WL 2051812 (S.D.N.Y. May 9, 2019).

    The option not to attempt to disentangle work performed on claims that are inextricably intertwined with others is one tool, among others, that a district court may use in its discretion to streamline the process of evaluating a request for an award of fees.  It permits the court to avoid parsing lawyers' billing records on a claim by claim basis—at best, a time-consuming task; at worst, an impossible one.  In this context, the Court approaches the tool with particular caution.  The Purchase Agreement limits the scope of the claims for which fees may be claimed.  An overbroad application of the "inextricably intertwined" concept to permit the reimbursement of the fees involved in CSE's defense of all of the claims in this case at all times, as advocated by Defendants,

would undermine the limitations in the Purchase Agreement regarding the scope of claims for which reimbursement may properly be claimed.

The Court has reviewed all of the time records line by line, but cannot conclude from them what amount was billed by counsel for covered claims. The records are reasonably descriptive, but do not consistently identify to which claims each lawyers' work was directed. The Court does not take issue with that limitation of counsels' records—the Court does not expect that counsel would, as a regular matter, allocate their work on a litigation matter to a particular claim. Oftentimes that would not be possible because work would relate to more than one claim.[6] However, the limitations of the time records require that the Court develop an alternative approach to exclude fees for work not covered by the fee-shifting agreement.

The Court will not reimburse fees charged by Bradley Arant Boult Cummings LLP ("Bradley"), CSE's Tennessee counsel, because that work was not reasonably necessary to litigate the claims covered by the fee-shifting provision. Bradley was retained as "co-lead counsel" for CSE. Declaration of Todd Presnell, Dkt. No. 186, ¶ 5. The lead partner from Bradley describes retention of Tennessee counsel as having been

> necessary to [CSE's] successful and efficient litigation of this action because (1) I represented CI and CF in the lawsuit filed by Tellico Village Property Owners Association in the Chancery Court for Monroe County, Tennessee; (2) Plaintiffs raised a number of legal issues arising under Tennessee law, including breach of the Settlement Agreement that Tennessee law governed, a claim under Tennessee's lien law, and a claim based on negligent misrepresentation under Tennessee law; and (3) relevant witnesses and documents were located in Tennessee.

*Id.* No member of the team from Bradley is described as having been a member of the New York bar. *Id.* ¶ 2. Bradley billed an aggregate of $552,804 in fees to the case, of which $173,301 was incurred prior to March 19, 2019. *Id.* ¶ 6.

---

[6] Defendants' counsel reviewed the time records and highlighted those instances where the records expressly referred to the motion to dismiss the Purchase Agreement. *See* Dkt. No. 203. The Court has reviewed the records and believes that the approach taken by Defendants substantially understates the amount of time spent working on covered claims.

Eliminating Bradley's fees from the fee application is a reasonable method to subtract fees incurred in connection with claims that were not covered by the Purchase Agreement's fee-shifting provision.  The only covered claims involved breach of contract under a New York law-governed contract.  CSE prevailed in those claims through motion practice in a motion to dismiss.  Claims by and against CI and CF were not covered by the Purchase Agreement's fee-shifting provision; nor were claims under the Settlement Agreement.  The expertise that Bradley brought to the table in this litigation was not necessary to litigate the claims covered by the Purchase Agreement's fee-shifting provision.  As a result, as a mechanism to exclude fees incurred in connection with uncovered claims, the Court will not award fees for the work conducted by Bradley.[7]

Costs incurred in connection with discovery should also be limited.  The claim for breach of the Purchase Agreement involved a pure matter of contractual interpretation—whether or not the Purchase Agreement gave rise to a duty to defend.  *See* Mar. 2019 Opinion.  For that reason, the Court was able to resolve the question definitively in its opinion regarding Defendants' motion to dismiss.  *Id.*  Resolution of that claim did not require substantial discovery.  Therefore, as a mechanism to limit the scope of the compensated fees to those that are covered by the fee-shifting provision, the Court will reduce by 90% all of the fees incurred by CSE's New York counsel, Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"), in the period between March 27, 2018 and March 18, 2019.  The 90% reduction reflects an estimate of the proportion of that time dedicated to the conduct of discovery.  A portion of the time billed did, however, relate to covered claims—in particular, CSE's response to Plaintiffs' proposed third amended complaint and its counterclaim under the Purchase Agreement—and should, therefore, be compensated.

---

[7]  The Court's determination is not a reflection on the quality of the work performed by the Bradley firm, which, as observed by the Court at trial, was very good.

The Court will award CSE 100% of Pillsbury's fees and expenses from the commencement of the litigation through March 27, 2018.  For counsel to evaluate and respond to the claim being pursued against CSE for breach of its obligations under the Purchase Agreement, counsel would need to consider and evaluate all of the issues raised in the case, which ultimately relate to the Purchase Agreement, even if they do not arise under it.  As a result, the Court will treat the uncovered claims as "inextricably intertwined" with the covered claims for the period from the commencement of the litigation through March 27, 2018.  Attempting to parse New York counsel's labor on the case by claim for that period would be unwieldy, and the Court has already adjusted the fee request substantially by eliminating the fees of the Bradley firm.

Only a small portion of the fees incurred by CSE following March 18, 2019 are compensable.  The claims tried to the Court were not compensable; nor are the costs of this motion.  As described above, the only covered claim during the summary judgment phase of the case was the claim for declaratory judgment as a prevailing party.  That motion did not rely on the fruits of discovery—it was predicated solely upon the Court's decision in its motion to dismiss.  Hence, it accounted for only a small portion of the briefing papers in the motion to dismiss.  The Court has weighed multiple options to determine a reasonable number of hours for the litigation of that claim, including the application of a percentage reduction to the aggregate amount billed by the Pillsbury firm during the relevant period, which amounted to $300,619.00.  Affidavit of Carolina A. Fornos, Dkt. No. 185 ("Fornos Decl."), ¶ 6.  Given that such a large percentage of that amount is related to uncovered claims, the Court has concluded that a more appropriate method is to estimate a reasonable number of hours for completion of legal research and writing for the component of the summary judgment motion practice attributable to the covered claim.  Because that issue was discrete and was not legally complex, the Court concludes that the following is a reasonable amount

of time to brief the issue in both CSE's summary judgment motion and reply: 6 hours of the time of a partner, and 10 hours of the time of a senior associate.

In sum, the Court will award CSE fees for the following periods of time in the following percentages: (1) inception of case through March 27, 2018: 100% of Pillsbury's reasonable hourly fees and expenses; (2) March 27, 2018 through March 18, 2019: 10% of Pillsbury's reasonable hourly fees; and (3) March 18, 2019 and thereafter: 6 hours of a partner's time and 10 hours of an associate's time. In arriving at these amounts, the Court has considered whether the amount of time billed was excessive. This approach is necessarily somewhat imprecise, yielding "rough justice"— but it is the result of a reasoned evaluation by the Court of the alternative mechanisms available to exclude non-compensable time from the fee award requested by CSE, and is informed by a review of the billing records presented by counsel and the record of the case as a whole.

### b. Reasonable Hourly Billing Rates

The hourly rates billed by Pillsbury for attorneys are reasonable. The hourly rates requested for Pillsbury, a New York-based law firm, range from $405 to $660 for associates and from $742 to $910 for partners. Fornos Decl., Ex. A–C. The amounts billed for attorneys at Pillsbury are within the spectrum for hourly rates approved in this district for attorneys at large New York City law firms involved in complex commercial litigation. *See, e.g., Themis Capital v. Democratic Republic of Congo*, No. 09-cv-1652, 2014 WL 4379100, at *7 (S.D.N.Y. Sept. 4, 2014) (observing that "partner billing rates in excess of $1000 an hour[ ] are by now not uncommon in the context of complex commercial litigation"); *Tessemae's LLC v. Atlantis Capital LLC*, 18-cv-4902, 2019 WL 2635956, at *4 (S.D.N.Y. June 27, 2019) (collecting cases supporting reasonableness of "hourly rates ranging from $250 to $1260 per hour[ ] for attorneys' work on a commercial litigation matter"); *LCS Grp. L.L.C. v. Shire L.L.C.*, 383 F. Supp. 3d 274, 279–80 (S.D.N.Y. 2019) (awarding $868 per hour for partners and $449.50 for an associate); *MSC Mediterranean Shipping Co. Holding S.A. v. Forsyth Kownacki LLC*, No.

16-cv-8103, 2017 WL 1194372, at *3 (S.D.N.Y. Mar. 30, 2017) (accepting hourly rates between $569.02 and $753.42 per hour for associates depending on seniority); *Errant Gene Therapeutic, LLC v. Sloane-Kettering Inst. for Cancer Rsch.*, 286 F. Supp. 3d 585, 588 (S.D.N.Y. 2018) (accepting partner hourly rate of $765); *Vista Outdoor Inc. v. Reeves Family Tr.*, No. 16-cv-5766, 2018 WL 3104631, at *5–6 (S.D.N.Y. May 24, 2018) (approving rates up to $1,260 for partners).  Moreover, the rates reflected in Pillsbury's billing records are those that their client was willing to pay.

However, the rates charged by Pillsbury for work by its legal assistants are not supported. The billing records show that Pillsbury billed for the time of Stephanie Korchinski at a rate of $465/hr.  The firm billed for the time of Liza Joglar at a rate of $400/hr.  The Court understands that both of these professionals are legal assistants.  The Court does not have information suggesting that either has particular skill, training, or experience that might justify those rates.  As a result, the Court concludes that the rates are excessive, and will reduce them to $150/hr., which is in line with prevailing rates for paralegals without specialized skills, training, or experience.

Applying these rates to the hours determined by the Court to be reasonable, the Court awards CSE attorneys' fees in the aggregate amount of $326,137.64,[8] plus expenses in the amount of $936.40, for a total of $327,074.04.

This amount of fees is not unreasonable in proportion to the amount involved in this litigation.  As described above, "[t]he rule in New York is that an award of fees in excess of the amount *involved* in a litigation would normally appear to be unreasonable."  *Diamond D Enters.*, 979 F.2d at 19 (2d Cir. 1992) (quotation omitted).  "[T]he amount reasonably in controversy in a litigation, not the amount actually recovered, is generally the ceiling on the fees that may be awarded

---

[8] The sum of $72,962 (Fornos Decl. Ex. A); $98,325 (Fornos Decl. Ex. B); $82,110.00 (Fornos Decl. Ex. C through March 27, 2018 with reduction to paralegal rates); $61,730.64 (Fornos Decl. Ex. C from March 28, 2018 with reduction to paralegal rates, decremented by 90%); plus $11,010 (6 hours of time at $910/hr. and 10 hours of time at $550/hr.).

pursuant to a fee-shifting clause.  This is only a rule of thumb, however.  It is a starting point in the process of ultimately determining whether a fee award is reasonable."  *Id.* at 19–20.

Plaintiffs argue that CSE's application for fees exceeds the amount involved in the dispute and that its fees should, therefore, be limited to $85,000 to $200,000.  Dkt. No. 190 at 15.  To reach this conclusion, Plaintiffs point to a settlement offer for $250,000 that they communicated on March 23, 2018.  *Id.* at 14.  But that single settlement offer is not an appropriate benchmark for the amount *involved* in this litigation.  The *ad damnum* for the claim for breach of the Purchase Agreement contained in the Second Amended Complaint demanded at least $600,000 in damages.  SAC ¶ 146 ("As a result of Defendant's breach of duty to defend, Plaintiff Flatiron incurred damages and losses, which continue to accrue, in an amount to be determined at trial, but in any event, not less than $600,000.").  CSE also notes that they received a settlement offer in December 2018 in which "Flatiron demanded $2 million to resolve this lawsuit and admitted that Flatiron would be entitled to legal fees."  Reply at 4.  Given that Plaintiffs demanded $600,000 for the breach of purchase claim alone, their attempt to argue that the amount involved in this litigation was limited to $250,000 because of a single, informal (and apparently fleeting) settlement offer lacks merit.[9]

## IV. CONCLUSION

For the reasons above, CSE's motion for attorneys' fees and costs is granted in part.  CSE is entitled to the reimbursement of $327,074.04 in fees and costs.  The Court will enter a separate order directing the entry of judgment in this case.

---

[9] In *Ortiz v. Regan*, the Second Circuit made the following remark, which also resonates here:  "The availability of Rule 68 of the Federal Rules of Civil Procedure gives additional weight to this point.  Rule 68 permits a party defending against a claim to make a settlement offer and thereby avoid any liability for costs, including attorney's fees, incurred after the making of the offer.  Regan could have made a formal offer of judgment pursuant to Rule 68 but chose not to use this procedure.  Absent a showing of bad faith, 'a party's declining settlement offers should [not] operate to reduce an otherwise appropriate fee award.'"  *Ortiz v. Regan*, 980 F.2d 138, 141 (2d Cir. 1992) (alteration in original) (citations omitted).

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 183.

SO ORDERED.

Dated:  February 9, 2022
New York, New York

_____
GREGORY H. WOODS
United States District Judge